No. 23-3354

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

IN RE: QUALCOMM ANTITRUST
LITIGATION

On Appeal from the United States District Court
for the Northern District of California
17-md-02773-JSC
Hon. Jaqueline S. Corley

---

## APPELLANTS' OPENING BRIEF
## REDACTED

---

Joseph W. Cotchett
Adam J. Zapala
Elizabeth Tran Castillo
COTCHETT, PITRE & MCCARTHY, LLP
840 Malcolm Road
Burlingame, CA 94010
(650) 697-6000
jcotchett@cpmlegal.com
azapala@cpmlegal.com
ecastillo@cpmlegal.com

Kalpana Srinivasan
Marc M. Seltzer
Amanda Bonn
SUSMAN GODFREY, LLP
1900 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
(310) 789-3100
ksrinivasan@susmangodfrey.com
mseltzer@susmangodfrey.com
abonn@susmangodfrey.com

*Attorneys for Appellants*

TABLE OF CONTENTS

Page No.

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ................................................... 7

ISSUES PRESENTED ........................................................................ 7

STATEMENT OF THE CASE ........................................................... 9

    I.    Factual Background ................................................................ 9

           A.    Qualcomm's Exclusive Dealing with Apple ............... 9

           B.    Qualcomm's Exclusive Dealing with Samsung ........ 16

           C.    Qualcomm and Chipset Competitors Confirm that Qualcomm's Exclusive Deals Resulted in Substantial Market Foreclosure .. 18

           D.    Plaintiffs' Experts Demonstrated the Anticompetitive Effects of Qualcomm's Exclusive Dealing ................................ 21

    II.    PROCEDURAL HISTORY AND RULING BELOW ...................... 23

STANDARD OF REVIEW ............................................................... 25

ARGUMENT ..................................................................................... 27

    I.    The Court Should Certify Questions TO THE CALIFORNIA SUPREME COURT AS To Qualcomm's Liability Under California LAW ................................................................................... 27

           A.    Certification Standard ............................................. 28

           B.    Certifying Questions of whether Qualcomm's Tying and Exclusive Dealing Violates the Cartwright Act Is Warranted .. 31

i

C.    Certifying Questions whether Qualcomm's Tying and Exclusive Dealing Violates the UCL Is Warranted .................34

II.    The District Court Abused Its Discretion by Refusing to Consider Plaintiffs' Supplemental Expert Report ...............................37

A.    Plaintiffs' Expert Supplemented His Report Not Because of a Change in Strategy—but a Change in the Law .......................37

B.    The Supplemental Expert Report Was Based on Evidence Already in the Record ...............................................................41

C.    The District Court Failed to Make Adequate Findings on Whether the Lack of Prior Disclosure was "Substantially Justified" or "Harmless" ...........................................................42

D.    The District Court Failed to Make Requisite Findings Whether Lesser Sanctions Would Be Adequate to Cure Any Prejudice.42

E.    The District Court Failed to Make Requisite Findings of Willfulness, Fault, or Bad Faith.................................................45

III.    The District Court Disregarded Triable Issues of Fact Showing that Qualcomm's Exclusive Dealing Violated the Cartwright Act and UCL ..............................................................................................46

A.    Plaintiffs Showed Triable Issues of Fact regarding Antitrust Injury ........................................................................................47

B.    Plaintiffs Showed Triable Issues of Fact Regarding Market Foreclosure.................................................................................48

IV.    The District Court Erred in Dismissing Plaintiffs' Tying Claims Under California Law.........................................................................52

A.    Plaintiffs Stated a Claim for Tying Claims under the Cartwright Act .............................................................................................52

B.   Plaintiffs Stated a Tying Claim Based on Qualcomm's "No License, No Chips" Policy and Conduct ...................................55

C.   Plaintiffs Stated a Tying Claim under the UCL.......................58

D.   Plaintiffs' Tying Allegations Met All Tests for Unfairness under the UCL...............................................................................59

     1.   Plaintiffs Alleged Unfairness under the UCL "Balancing Test".................................................................................59

     2.   Plaintiffs Alleged Unfairness under the UCL "Tethering Test".................................................................................61

     3.   Plaintiffs Alleged Unfairness under the UCL "Consumer Injury" Test ..............................................................................62

CONCLUSION ......................................................................................63

iii

## TABLE OF AUTHORITIES

**Page No.**

**Cases**

*Am. Ad Manage., Inc. v. GTE Corp.*,
　92 F.3d 781 (9th Cir. 1996) ...............................................................5

*Arizona v. Standard Oil Co.*,
　906 F.2d 432 (9th Cir. 1990) ............................................................5

*Aryeh v. Canon Bus. Sols., Inc.*,
　55 Cal.4th 1185 (2013) ...............................................2, 31, 32, 35

*In re Automobile Antitrust Cases I & II*,
　1 Cal.App.5th 127 (2016), *rev. denied* ............................................57

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
　9 F.4th 1102 (9th Cir. 2021) ............................................................30

*Barnes-Wallace v. City of San Diego*,
　607 F.3d 1167 (9th Cir. 2010) .........................................................29

*Barquis v. Merch. Collection Ass'n*,
　7 Cal.3d 94 (1972) ...........................................................................36

*Botosan v. Paul McNally Realty*,
　216 F.3d 827 (9th Cir. 2000) ...........................................................26

*Brooks v. Bank of Am., N.A.*,
　No. 20-cv-01348-BAS-LL, 2021 WL 1541643 (S.D. Cal. Apr. 20,
　2021) ................................................................................................58

*Calnetics Corp. v. Volkswagen of Am., Inc.*,
　532 F.2d 674 (9th Cir. 1976) ...........................................................26

*Camacho v. Auto. Club of S. Cal.*,
　142 Cal.App.4th 1394 (2006) ..........................................................62

*Caudle v. Bristow Optical Co.*,
　224 F.3d 1014 (9th Cir. 2000) ...................................................44, 45

iv

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
   20 Cal.4th 163 (1999) ............................................................... 35, 37, 60

*Cellular Plus, Inc. v. Super. Ct.*
   (1993) 14 Cal.App.4th 1224 ............................................................. 2, 31

*Chelson v. Oregonian Pub. Co.*,
   715 F.2d 1368 (9th Cir. 1983) ................................................................. 5

*In re Cipro Cases I & II*,
   61 Cal.4th 116 (2015) ................................................................... *passim*

*City of Long Beach v. Standard Oil Co.*,
   872 F.2d 1401 (9th Cir. 1989) ................................................................. 5

*City of Vernon v. S. California Edison Co.*,
   955 F.2d 1361 (9th Cir. 1992) ............................................................... 40

*Comput. Task Gr., Inc. v. Brotby*,
   364 F.3d 1112 (9th Cir. 2004) ............................................................... 46

*Corwin v. L.A. Newspaper Serv. Bureau, Inc.*,
   4 Cal.3d 842 (1971) ....................................................................... 26, 56

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*,
   773 F.2d 1506 (9th Cir. 1985) ............................................................... 45

*Dukes v. Wal-Mart Stores, Inc.*,
   No. C-01-02252-CRB, 2012 WL 4329009 (N.D. Cal. Sept. 21,
   2012) ............................................................................................ 38

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ............................................................................ 26

*Falk v. Allen*,
   739 F.2d 461 (9th Cir. 1984) ................................................................. 43

*Feldman v. Sacramento Bd. of Realtors, Inc.*,
   119 Cal.App.3d 739 (1981) ................................................................... 30

*Fisherman's Wharf Bay Cruise Corp. v. Sup. Ct.*,
   114 Cal.App.4th 309 (2003) .......................................... 49, 50, 51, 56

*Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*,
    55 Cal.App.4th 381 (2020) ....................................................30

*FTC v. Qualcomm Inc.*,
    411 F. Supp. 3d 658 (N.D. Cal. 2019) ...................................24

*FTC v. Qualcomm Inc.*,
    969 F. 3d 974 (9th Cir. 2020) ........................................*passim*

*Glaberson v. Comcast Corp.*,
    295 F.R.D. 95 (E.D. Pa. 2013)...............................................40

*Gulfstream Aerospace Corp. v. Mayacamas Corp.*,
    485 U.S. 271 (1988)................................................................40

*Hesse v. Grossman*,
    152 Cal.App.2d 536 (1957) ....................................................35

*Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*,
    No. 15-CV-1576-AJB-RBB, 2016 WL 4087302 (S.D. Cal. Aug. 1,
    2016) .......................................................................................61

*Intel Corp. v. Fortress Inv. Grp. LLC*, *Brief of Amici Curiae Fair
    Standards Alliance*,
    No. 3:19-cv-07651-EMC, 2020 WL 1983487 (N.D. Cal. Mar. 19,
    2020) .......................................................................................60

*Korea Kumho Petro. v. Flexsys Am., LP*,
    No. C07-01057 MJJ, 2008 WL 686834 (N.D. Cal. Mar. 11, 2008).................36

*Kwikset Corp. v. Sup. Ct.*,
    51 Cal.4th 310 (2011) ................................................35, 58, 59

*Liberty Ins. Corp. v. Brodeur*,
    41 F.4th 1185 (9th Cir. 2022) ................................................42

*Lopez v. Smith*,
    203 F.3d 1122 (9th Cir. 2000) (*en banc*)...............................26

*Lozano v. AT&T Wireless Services, Inc.*,
    504 F.3d 718 (9th Cir. 2007) ...........................................37, 60

vi

*Luke v. Fam. Care & Urgent Med. Clinics*,
   323 F. App'x 496 (9th Cir. 2009) ........................................................38

*McKown v. Simon Prop. Grp. Inc.*,
   689 F.3d 1086 (9th Cir. 2012) ...........................................................29

*Mendoza v. Nordstrom, Inc.*,
   778 F.3d 834 (9th Cir. 2015) .............................................................29

*Merchant v. Corizon Health, Inc.*,
   993 F.3d 733 (9th Cir. 2021) .............................................................44

*MGM Studios, Inc. v. Grokster*,
   269 F. Supp. 2d 1213 (C.D. Cal. 2003) ..............................................36

*Mineral C'ty v. Walker River Irrigation Dist.*,
   900 F.3d 1027 (9th Cir. 2018) ...........................................................33

*Morrison v. Viacom*,
   66 Cal.App.4th 534 (1998) .....................................................52, 53, 54

*People ex rel. Mosk v. Nat'l Research Co.*,
   201 Cal.App.2d 765 (1962) ........................................................35, 36

*Movie 1 & 2 v. United Artist Comms.*,
   909 F.2d 1245 (9th Cir. 1990) .............................................................5

*Ohio v. Roberts*,
   448 U.S. 56 (1980) .............................................................................41

*Poller v. Columbia Broad.*,
   368 U.S. 464 (1962) ...........................................................................26

*In re Qualcomm Antitrust Litig.*,
   292 F. Supp. 3d 948 (N.D. Cal. 2017) .........................................*passim*

*R&R Sails, Inc. v. Ins. Co. of Pa.*,
   673 F.3d 1240 (9th Cir. 2012) .................................................43, 45, 46

*Samsung v. Panasonic*,
   747 F.3d 1199 (9th Cir. 2014) .................................................16, 31

vii

*Stromberg v. Qualcomm Inc.*,
14 F. 4th 1059 (9th Cir. 2021) ...................................................24

*Trujillo v. C'nty of L.A.*,
751 F. App'x 968 (9th Cir. 2018) ...........................................26

*U.S. for Use of Wiltec Guam v. Kahaluu Constr.*,
857 F.2d 600 (9th Cir. 1988) .................................................46

*U.S. v. $11,500.00 in U.S. Currency*,
710 F.3d 1006 (9th Cir. 2013) ...............................................44

*Winter ex rel. U.S. v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*,
953 F.3d 1108 (9th Cir. 2020) ...............................................26

*U.S. v. Nat. Med. Enters., Inc.*,
792 F.2d 906 (9th Cir. 1986) .................................................43

*U.S. v. Sumitomo Marine & Fire Ins. Co.*,
617 F.2d 1365 (9th Cir. 1980) ...............................................46

*UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*,
169 Cal.App.4th 357 (2008) .................................................56

*Vazquez v. Jan-Pro Franchising Int'l, Inc.*,
939 F.3d 1045 (9th Cir. 2019) .................................28, 29, 32

**Statutes**

28 U.S.C. § 1291 ....................................................................7

28 U.S.C. § 1332(d) ...............................................................7

28 U.S.C. § 1367 ....................................................................7

**Other Authorities**

Federal Rules Appellate Procedure

4(a)(1)(A) ...............................................................................7

Federal Rule of Civil Procedure

1 .................................................................................................................41

37(c) ...........................................................................................................42

37(c)(1) ................................................................................................42, 44

## INTRODUCTION

Plaintiffs filed this antitrust and consumer protection class action because Qualcomm's conduct forced California consumers to unknowingly pay artificially inflated prices for their smartphones, tablets, and cellular devices—all in violation of California antitrust and consumer protection laws. 15-ER-3351-15-ER-3420 ("Plaintiffs' Second Amended Consolidated Class Action Complaint" or "CCAC").

The district court erroneously granted Qualcomm's motion to dismiss Plaintiffs' tying and refusal to deal claims under California law, 1-ER-0019-1-ER-0055 ("MTD Order") and later granted summary judgment as to Plaintiffs' remaining exclusive dealing claim. *See* 1-ER-0004-1-ER-0018. In granting Qualcomm's motion to dismiss, the district court followed the reasoning of this Court in *FTC v. Qualcomm*—*i.e.*, that consumer harms are not "'anticompetitive' in the antitrust sense." *See FTC v. Qualcomm Inc.*, 969 F. 3d 974, 999 (9th Cir. 2020). The district court thus abandoned California antitrust law's foundational consumer-welfare principle, and its decision should be reversed.

While this Court's decision in the *FTC v. Qualcomm* case construed *federal* law, this case presents the very separate question of whether Qualcomm's conduct violated California's Cartright Act and Unfair Competition Law. This Court has long found that federal and California antitrust regimes differ in important ways.

1

*See Cellular Plus, Inc. v. Super. Ct.* (1993) 14 Cal.App.4th 1224, 1242; *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal.4th 1185, 1195 (2013)

In this case, Plaintiffs brought claims for tying, refusal to deal, and exclusive dealing under California's Cartwright Act and Unfair Competition Law ("UCL")—*i.e.*, two California statutes that are specifically directed at customer-oriented anticompetitive conduct. There is little reason to think that the California Supreme Court would assess Qualcomm's tying and exclusive dealing under these California statutes by relying on the same reasoning as the *FTC* decision, or that the California Supreme Court would similarly conclude that the issue whether the all-in price Original Equipment Manufacturers ("OEMs") paid for chipsets was reasonable is an issue that "sound[s] in patent law, not antitrust law." *FTC*, 969 F.3d at 1002. Nor would the California Supreme Court likely follow *FTC's* finding that, because Qualcomm's conduct "involve[d] potential harms to Qualcomm's *customers*, [and] not its competitors," that that conduct could not show harm to competition "in the relevant antitrust markets." *Id.* (emphasis added).

Thus, at a minimum, this Court should certify the following questions to the California Supreme Court:

(1) Does California antitrust law follow federal antitrust law, as set forth in *FTC v. Qualcomm*, 969 F.3d 974 (9th Cir. Aug. 11, 2020), in barring Appellants' claims for relief against Qualcomm?

2

(2) Is forcing OEMs to accept supra-FRAND (Fair, Reasonable, and Non-Discriminatory) licenses in a tied market for Standard-Essential Patents by using market power in the market for tied chipset products (both CDMA and Premium LTE) actionable under the Cartwright Act (Cal. Bus. & Prof. Code §§ 16700 *et seq*.) and Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq*.) if the alleged conduct involves direct harm to the defendant's customers, and alleged harm to its competitors?

(3) Under the Cartwright Act and the UCL, may higher consumer prices and economic harm to OEMs be considered "anticompetitive in the antitrust sense", even if they do not involve restraints on trade or exclusionary conduct in "the area of effective competition", as stated in *FTC v. Qualcomm*?

(4) Does liability for exclusive dealing arrangements with OEMs under the Cartwright Act and Unfair Competition Law depend on a "pass-through" analysis of antitrust injury for each affected market (*e.g.*, the CDMA and "premium LTE" chipset markets), when a plaintiff presents evidence that the exclusive dealing arrangements both increased chipset prices paid by OEMs for chipsets and caused damages to the California indirect purchaser class?

Upon remand from *FTC v. Qualcomm*, Plaintiffs sought to introduce a supplemental expert report from one of their experts, which was offered for the limited purpose of tailoring their original expert report to the sole theory of

3

antitrust damage that remained viable after this Court's decision in *FTC* altering the law of the case and the dismissal of Plaintiffs' amended complaint upon remand. The district court improperly denied Plaintiffs' efforts, making no findings under Rule 16 that Plaintiffs lacked good cause, or had not been diligent, or could somehow have foreseen the changed circumstances warranting supplementation of an expert report that had been submitted years earlier when the district court had originally found all such theories viable in the original motion to dismiss. *See In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948 (N.D. Cal. 2017) (Koh. J.) (upholding all of Plaintiffs' substantive law claims included in this appeal).

The district court then further abused its discretion in affirmatively excluding the supplemental expert report at summary judgment, without making requisite findings that the failure to disclose the report previously was neither "substantially justified" nor "harmless" under Rule 37, nor that a sanction lesser than exclusion (tantamount to dismissal in the case) would be inadequate to cure any prejudice to Defendant, nor that Plaintiffs' proffer of the report was the result of "willfulness, fault, or bad faith." The district court instead held Plaintiffs responsible for their "strategic choices"; but the supplemental report was necessary, not because of a change in *strategy*, but a change in the *law*. *Compare FTC*, 969 F.3d 974 *with In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948.

4

This Court should not establish a rule that requires litigants to engage experts to work up every conceivable measure of antitrust damages—including those not based on current, governing authority—on the off-chance the law could change mid-proceeding.

The district court also erred in dismissing Plaintiffs' tying and refusal to deal claims on the motion to dismiss, and in disregarding triable issues of material fact establishing liability for exclusive dealing under the Cartwright Act and UCL. 1-ER-0004-1-ER-0018; 1-ER-0019-1-ER-0055. Qualcomm's coercive tying and exclusive dealing distorted the market, raised its rivals' costs, and increased the total cost for OEMs, as well as the quality-adjusted prices charged to California consumers. The costs of the unfair and unlawful market-distorting payments were passed on to consumers in the form of inflated prices for cellular devices. *See* 15-ER-3351-15-ER-3420; 5-ER-0870-5-ER-0901.

The district court erred in granting summary judgment for Qualcomm, overlooking the many Ninth Circuit precedents reversing summary judgment in the antitrust context.[1] Plaintiffs' evidence raised a genuine dispute of material fact that

---

[1] *See*, *e.g.*, *Am. Ad Manage., Inc. v. GTE Corp.*, 92 F.3d 781 (9th Cir. 1996) (reversing summary judgment in antitrust case); *Arizona v. Standard Oil Co.*, 906 F.2d 432 (9th Cir. 1990) (same); *Movie 1 & 2 v. United Artist Comms.*, 909 F.2d 1245 (9th Cir. 1990) (same); *City of Long Beach v. Standard Oil Co.*, 872 F.2d 1401, 1405 (9th Cir. 1989) (reversing summary judgment for defendants in antitrust conspiracy); *Chelson v. Oregonian Pub. Co.*, 715 F.2d 1368, 1371 (9th

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████ coerced Apple and Samsung to drop (or not incorporate) chipsets from competing modem chip manufacturers, thereby "stymieing" competition in the relevant chipset markets. 5-ER-0870-5-ER-0901. As a result, Qualcomm maintained and expanded its monopoly power. Qualcomm's exclusive dealing arrangements allowed it to keep chipset prices artificially high, requiring California consumers to pay more for cellular devices than they would have absent the unlawful exclusivity deals thereby foreclosing a substantial share of the market for its closest competitors. 5-ER-0870-5-ER-0901; *see also* 2-ER-0103-2-ER-0115("Plaintiffs' Sur-Reply").

This case has wide-ranging policy and consumer protection implications, and it should be decided on the merits. The case should not be decided on the basis of a discovery sanction excluding a supplemental expert report—when lesser sanctions were available to the district court and could have cured any possible prejudice. Because Plaintiffs' tying and exclusive dealing claims are "novel", this

---

Cir. 1983) (reversing summary judgment on antitrust injury because of disputed issue of fact whether plaintiff's injury was "inextricably intertwined").

6

Court should certify these questions to the California Supreme Court in the interests of comity, for an authoritative determination.

This Court should reverse the district court's dismissal and summary judgment decisions based on the facts and clear Ninth Circuit law. In the alternative, the Court should certify the questions of California law set forth below to the California Supreme Court for determination in the first instance.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction of Plaintiffs' claims under 28 U.S.C. § 1332(d) and 28 U.S.C. § 1367. The district court entered final judgment in this matter on October 5, 2023. Appellants appealed from this judgment, as well as from the January 6, 2023 Order of the district court regarding the Motion to Dismiss, and that court's September 26, 2023 Order Re: Motion for Summary Judgment), filing a timely notice of appeal on November 2, 2023. 4-ER-0688-4-ER-0691; *see* Fed. R. App. P. 4(a)(1)(A). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Whether California antitrust law would follow federal antitrust law, as set forth in *FTC v. Qualcomm*, 969 F.3d 974 (9th Cir. Aug. 11, 2020), to bar Appellants' claims for relief against Qualcomm, and whether that question should be certified to the California Supreme Court.

7

2.      Whether Qualcomm violated California's Cartwright Act and Unfair Competition Law by coercing OEMs to accept supra-FRAND ("Fair, Reasonable and Non- Discriminatory") licenses in a tied market for Standard-Essential Patents by using market power in the market for tied chipset products (both CDMA and Premium LTE), and whether that question should be certified to the California Supreme Court.

3.      Whether Qualcomm's exclusive dealing arrangements with Apple and Samsung violated California's Cartwright Act and UCL, and whether that question should be certified to the California Supreme Court.

4.      Whether the district court erred in dismissing Plaintiffs' tying, refusal to deal, and exclusive dealing claims under California law, and whether that question should be certified to the California Supreme Court.

5.      Whether the district court erred in refusing to consider the Supplemental Report of Plaintiffs' expert, Dr. Kenneth Flamm, which was based on existing record evidence, and which isolated the damages arising solely from the remaining viable theory of antitrust injury (*i.e.*, exclusive dealing) from other, no-longer-pending theories, as required under Ninth Circuit law.

## STATEMENT OF THE CASE

### I.    Factual Background

From 2011 to 2016, Qualcomm was the world's largest manufacturer of CDMA and premium LTE chipsets.  Qualcomm sells CDMA and premium LTE chipsets that are incorporated by Original Equipment Manufacturers (OEMs) into cellular devices, which are then sold to California consumers ("the Class"). *See* CCAC (15-ER-3351 *et seq.*). During the class period, Qualcomm intentionally eliminated competition from rival chipset manufacturers like Intel, Ericsson, Broadcom, Marvell, and MediaTek, through anticompetitive exclusive dealing arrangements with the two largest OEMs, Apple and Samsung.  Qualcomm had a pattern and practice of attempting to force exclusive arrangements on OEMs.  *See* 13-ER-2957 to 13-ER-3073 (Expert Report of Professor Einer Elhauge); 14-ER-3075 to 14-ER-3263 (Rebuttal Report of Professor Einer Elhauge); 8-ER-1557 to 8-ER-1763 ¶¶ 25-71 (Flamm Supp. Report).  Both Apple and Samsung had considered developing in-house chip manufacturing capabilities during the relevant period, but Qualcomm's exclusive agreements with these OEMs precluded them from competing as chip suppliers.  *See id.* (Flamm Supp. Report).

### A.    Qualcomm's Exclusive Dealing with Apple

Qualcomm used its monopoly power in the CDMA chipset market to force Apple to drop (or not incorporate) competitor chipsets in all of its cellular devices.

9

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████ 13-ER-2957 to 13-ER-3073 (Elhauge

Report) ¶¶ 116-17. ████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████. 8-ER-1764 to 8-ER-1781

(FTC-PROD-0012102). ██████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████ 8-ER-1782 to 8-ER-

1808 (FTC-PROD-0003422). ██████████████████████████

██████████████████████████████████████████████

████████████████████████████ *Id.*; 8-ER-1809 to 8-ER-1811(AAPL-

FTC-00100707 – AAPL-FTC-00100) ██████████████████████

███████████████████████████████████████████████

█████████████████████████████. 8-ER-1557 to 8-ER-1763 ¶¶

110, 143, 187, 190-95; *see also* 13-ER-3020 to 13-ER-3073 (Elhauge Report); 14-

ER-3214 to 14-ER-3257 (Elhauge Rebuttal Report).

Qualcomm learned of the progress competitor chipset manufacturers were

making with Apple: █████████████████████████████████████

███████████████████████████████ 8-ER-1816 through 8-ER-

1833 (Q2017MDL1 _01955666). Qualcomm understood that Intel's chipsets had

advantages over Qualcomm's chipsets due to having a ███████████████████

███████████████████████████████████████████ 8-ER-1557

to 1763 (Flamm Supp. Report) ¶ 113; *see also id*. ¶¶ 112-16 (█████████

██████████████████████████); *see also* 13-ER-2957 to 13-ER-3073 ¶¶

16, fn 263, 126, 133-134, 138-139, 141-143, 146-58 (Elhauge Report).

Qualcomm recognized that it could use its market power to suppress Intel's

competition: in a September 2012 board presentation, Qualcomm reiterated: "████

██████████████████████████████████████

██████████████ 8-ER-1816 through 8-ER-1833 (Q2017MDL1_02586349);

*see also* 9-ER-1835 at 51 ██████████████████████████

██████████████████████████████████

████████████████████████████████████

██████████

Qualcomm began to aggressively leverage its CDMA monopoly power to

stifle the competition that was gaining traction at Apple. ████████████

██████████████████████████████████████

██████████████████████. 13-ER-2957 (Elhauge Report) ¶

11

117; 8-ER-1557 (Flamm Supp. Report) ¶ 28.[2] █████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████

        ████████████████████████████████████████████

███████████████████████████████████ 8-ER-1557 (Elhauge

Report) ¶ 117. ████████████████████████████████████████

█████████████████████████████████████████████

██████  *Id.* ¶ 117; 9-ER-1913 through 9-ER-1926 (APL-QC-FTC_00000024); *see*

*also* 12-ER-2827 through 12-ER-2833 (Blevins Dep. at 162:18-163:3). ███████

██████████████████████████████████████████████████████.

8-ER-1557 (Flamm Supp. Report) ¶ 110; 13-ER-2957 to 13-ER-3073 ¶¶ 16, fn

263, 126, 133-134, 138-139, 141-143, 146-58 (Elhauge Report).

        Having foreclosed competition, ██████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████. 8-ER-1557 (Flamm

---

[2] The terms of this agreement related to Apple's "transition" to exclusively
using Qualcomm chips in all Apple products.

12

Supp. Report) ¶ 32; 13-ER-2957 (Elhauge Report) ¶¶ 113-122. 

; *see also* 9-ER-1913 through 9-ER-1926 (APL-QC-FTC_00000021-25); 13-ER-2957

(Elhauge Report) ¶ 118.

. 9-ER-1927 to 9-ER-1935 (FTC-Apple-

0000080); 13-ER-2957 (Elhauge Report) ¶¶ 119-21.

. 9-ER-1927 to 9-ER-1935 (FTC-Apple-0000080-83).

13

███████████████████████████████████████████. *Id.*
at 81-84.

████████████████████████████████████

█████████████████████████████████████████████

9-ER-1936 to 1964 (Apple Nov. 13, 2016 Response to CID Specification at 4).

████████████████████████████████████

███████████████████████████████████

████████████████████████████████████. 9-ER-1964 to

1966 (AAPL-FTC-00081011) ████████████████████

██████████████████████████████ *see also* 9-ER-

1967 to 1970 (APL-QC-FTC_01552044) (stating that Apple was ██████

████████████████████████████████████

████████████████████████████████ These

predictions turned out to be correct: after Apple announced that it would source

exclusively from Qualcomm, ████████████████████████████

█████. 12-ER-2827 (Blevins Dep.) at 190:15-191:22.

Apple ████████████████████████████ for Apple's

2013 product launches because ████████████████████

█████████████████████████████████████

███████████████████████████████ 8-ER-1782

14

(FTC-PROD-0003421). ███████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ 9-ER-1971(Q2014FTC03651454); 9-ER-

1982 (Q2014FTC03651453); *see also* 12-ER-2886 (Constantine Dep.) at 10:12-20.

Qualcomm now refers to these substantial rebates as "discounts," but Plaintiffs'

expert, Professor Elhauge, had originally found that the rebates were, in fact,

loyalty *penalties* designed to foreclose competition. 13-ER-2957 (Elhauge Report)

¶¶ 8, 114, 127-35. In his own supplemental report, Dr. Flamm likewise found that

Qualcomm's chipset prices to Apple were ████████████████████████

████████████████████████████████████████████

███████████████████████████████████

████████████████ 8-ER-1557 (Flamm Supp. Report) ¶¶ 158-200.

Apple itself understood that Qualcomm's exclusive deals meant that it

purchased chipsets at elevated, supra-competitive prices. For example, Tony

Blevins—Apple's Vice President for Procurement during the relevant period—

testified ████████████████████████████████████

██████████████████████████. 12-ER-2834 (Blevins Dep.) at 105:15-

106:5 ████████████████████████████

15

███████████████████████████████████████████

██████████████████████████████████ *see also id.* at 108:8-109:21.

Mr. Blevins' testimony was clear: ████████████████████████████

███████████████████████████████████████████

████████████████████ 12-ER-2834 (Blevins Dep.) at 116:15-117:4 (emphasis added). Qualcomm's exclusive dealing with Apple—characterized by loyalty penalties and supra-competitive, inflated chipset prices—were effectively payments made so that Qualcomm could be a 100% monopolist over Apple's customers. 8-ER-1557 (Flamm Supp. Report) ¶¶ 138, 158-200; 13-ER-2957 (Elhauge Report) ¶¶ 113-158; 14-ER-3075 (Elhauge Rebuttal) ¶¶ 266-354.

### B. Qualcomm's Exclusive Dealing with Samsung

After Apple told Qualcomm that it would no longer be exclusive, Qualcomm significantly ██████████████████████████████████████

████████████████████████████ In a May 29, 2014 email, O.H. Kwon in QCT sales recognized the importance of keeping chipset competitors from ██████████████████████████████████

███████████████████████████████████████████

████████████████████████████ 9-ER-1984 (Q2014FTC03824293) (emphasis added).

16

For the period from December 1, 2014 to November 30, 2015, Qualcomm

required ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████ 8-ER-1557 (Flamm Supp. Report) ¶¶ 41-54.  In July 2016, Qualcomm

made a similar proposal to ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████ *Id.* ███████████████████████████████████████

███████████████████████████████████████████████ *Id.*

By 2018, Qualcomm required ████████████████████████████

████████████████████████████████████████████████

█████████████████████████████ 8-ER-1557 (Flamm Supp. Report ¶ 54).

According to Qualcomm's own data, ████████████████████████████

████████████████████████████████████████████████████

8-ER-1557 (Flamm Supp. Report) ¶ 54. ████████████████████████

███████████████████████████████████████████ *Id.*

17

**C.** **Qualcomm and Chipset Competitors Confirm that Qualcomm's Exclusive Deals Resulted in Substantial Market Foreclosure**

Qualcomm's decision to focus on exclusive dealing arrangements with both Apple and Samsung was not a coincidence; it offered these incentives to █████ ████████████████████████████████████████████████ ████████████████████ according to Qualcomm's co-founder, Irwin Jacobs. 9-ER-1992 (Q2017MDL1_01167846). Qualcomm understood that if these OEMs could be locked up through exclusivity arrangements, Qualcomm could force competing chipset manufacturers out of business. *See*, *e.g.*, 12-ER-2857 (Mahe Dep.) at 232:4-10 ████████████████████████████████████████ ███████████████████████. In August 2010, discussing the concept of chipset exclusivity, Qualcomm CEO Steve Mollenkopf wrote: █████ ████████████████████████████████████████████████ ████████████████████████████████████████ 9-ER-1996 to 1999; 9-ER-2000 to 20113 (emphasis added).

A June 2012 Qualcomm strategic plan likewise stated that █████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ 10-ER-2015 to 2310. Qualcomm has admitted that Apple and Samsung were ████ ████████████████████████████████████ 12-ER-2817 (Amon

18

Dep.) at 32:11-23.  Because ███████████████████████

███████████████████████████  Qualcomm understood that

█████████████████████████████████████████████

████████████████████████████████████████

███████   12-ER-2822 (Mollenkopf Dep.) at 174:19-21; 12-ER-2822 at 15:4–13.

Qualcomm's rival chipset manufacturers also recognized the importance of

Apple and Samsung as customers.  Apple had the largest share of phone sales

globally.  12-ER-2598 (QNDCAL05898145).  As Intel's Corporate Vice President

Aichatou Evans testified with respect to Apple,



12-ER-2890 (Evans Dep.) at 22:16 - 23:1.

Ericsson and MediaTek—both rival chipset suppliers—testified that ███████

███████████████████████████████████████

██████████████████████████████  *See*, *e.g.*, 12-ER-

2881 (Zander Dep.) at 222:15-18 ███████████████████

█████████████████████████████████████████████

█████████████████████████████████████  13-ER-

2917 (Loh Dep.) at 196:10-23 ████████████████████

████████████████████████████████

Evans testified that ██████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████ 13-ER-2897

(Evans Dep.) at 347:20-348:5.

Indeed, Intel had ████████████████████████

█████████████ 13-ER-2910 (Straub Dep.) at 140:12-141:13. ██████

████████████████████████████████

████████ *Id.* at 143:23-144:13; *see also* 13-ER-2903 (Evans Dep.) at

129:17–130:2.  Had Intel not been excluded from earlier WCDMA (UMTS)-plus-

premium-LTE design wins, its CDMA business would have advanced at least two

years earlier.  The fact that Intel was awarded Apple's iPhone business for the

2018 launch (CDMA and LTE) underscores that Qualcomm would have faced

competition from Intel in both the CDMA and premium-LTE spaces earlier had it

not been previously excluded from wins.  *See* 12-ER-2864 (Schafer Dep.) 121:23-

122:5.

20

Moreover, chipset sales to Apple or Samsung came with a ███████

██████████████████████████████████████████████████

██████████ 13-ER-2903 (Evans Dep.) at 89:24-90:2 ████████

██████████████████████████████████████

█████████ Winning a "socket" with a large customer ████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████ 12-ER-2870 (Johnson

Dep.) at 124:7 - 125:5; *see also* 13-ER-2903 (Evans Dep.) at 101:10-17 (Apple is

the most important OEM for a modem chip supplier); 13-ER-2910 (Straub Dep.) at

51:21-52:13 █████████████████████████████████

███████████████████████████████████████████

████████████████████████ *see also* 12-ER-2618 (INTEL-

QCOM000573550); 13-ER-2921 (Moynihan Dep.) at 399:2-17.

### D. Plaintiffs' Experts Demonstrated the Anticompetitive Effects of Qualcomm's Exclusive Dealing

Plaintiffs' experts—Professor Einer Elhauge and Dr. Flamm (through his

supplemental report)—discussed, isolated and quantified the harm arising solely

from Qualcomm's exclusive dealing agreements. Dr. Flamm supplemented his

21

report because his previous analysis assessed the combined anticompetitive harms arising from all of the exclusionary practices originally alleged (and upheld) in the case. *See, e.g., In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948 (N.D. Cal. 2017) (Koh. J.). Qualcomm's exclusive dealing harmed competition and Plaintiffs by (1) crippling Qualcomm's chipset rivals by precluding them from working with Apple, thereby reducing competition in the market; and (2) by directly raising prices to Apple's end users through exclusive deals that gave Qualcomm the ability to charge Apple monopoly prices, which were then passed on to consumers. 8-ER-1557 (Flamm Supp. Report) ¶¶ 158-200; *see also* 13-ER-2957 (Elhauge Report) ¶¶ 113-158); 14-ER-3075 (Elhage Rebuttal Report) ¶¶ 266-354.

Dr. Flamm quantified this harm in his Supplemental Report by analyzing: (1) the amount all prices would have been lower 'but for' the effects of Qualcomm's exclusive dealing with Apple on Qualcomm's rivals, *id.* ¶¶ 168-97; and (2) the amount that Apple iPhone customers themselves would have paid less, had Apple and Qualcomm not entered into an exclusive dealing arrangement, *id.* ¶¶ 158-67. With respect to the "direct" overcharge paid by Apple's customers, Dr. Flamm calculated the direct impact of exclusivity: Qualcomm's chipset prices paid by Apple were approximately 3% higher than they would have been during the period in which the exclusive agreements were in effect (from the end of 2011 through the second quarter of 2016). *Id.* ¶¶ 158-67. The average gross chipset

price to Apple during this period was $21.09, and the average overcharge per chip was $0.70 (totaling some $658 million globally). *Id.* Consistent with Dr. Flamm's prior opinions, those overcharges were passed on to consumers. *Id.* ¶¶ 198-201.

Turning to the "indirect" harm caused by decreased competition, Dr. Flamm discussed the interaction between competition and prices, and used these two lines of analysis to calculate the indirect chipset overcharge attributable to Qualcomm's exclusive dealing. *Id.* ¶¶ 168-197. He calculated that, but for Qualcomm's exclusive dealing arrangements' impact on competitors, Qualcomm's chip prices alone would have been $2.14 billion lower globally during the class period. These calculations are conservative to the extent they are limited to the effect that market competition had on Qualcomm's own prices, since increased competition would have lowered market-wide prices. *Id.* Using a channel-weighted pass-through analysis, Flamm calculated damages to the California indirect purchaser class to be between $41 million and $70 million. *Id.* ¶¶ 198-202.

## II.   PROCEDURAL HISTORY AND RULING BELOW

Plaintiffs originally filed suit against Qualcomm in April 2017 on behalf of a nationwide class of consumers, alleging violations of California's Cartwright Act and Unfair Competition Law ("UCL"), and Sections 1 and 2 of the Sherman Act. 4-ER-0626 to 0687. The district court substantially denied Qualcomm's original motion to dismiss in November 2017, and the district court subsequently certified a

23

nationwide class. *See In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948 (N.D. Cal. 2017) (Koh. J.); *see also* 4-ER-0581 to 0625.

In originally upholding Plaintiffs' complaint, the district court effectively found that all of Plaintiffs' claims—including supra-FRAND pricing, tying, exclusive dealing, and other forms of exclusionary conduct—were actionable. *See id*. It was on this basis that Plaintiffs originally proffered their expert reports, which analyzed antitrust impact based on the combined effect of all of the exclusionary conduct that the district court found to be actionable.

After the district court granted class certification, the Ninth Circuit granted Qualcomm's Rule 23(f) petition to appeal the district court's class certification decision.

In the meantime, the FTC brought and tried a similar case against Qualcomm under federal law. There, after a full trial on the merits, the district court found that Qualcomm violated federal antitrust law. *See FTC v. Qualcomm Inc.*, 411 F. Supp. 3d 658 (N.D. Cal. 2019). But the Ninth Circuit reversed that decision in *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. Aug. 11, 2020).

The Ninth Circuit then vacated the certification of the nationwide class in Plaintiffs' case and remanded. *See Stromberg v. Qualcomm Inc.*, 14 F. 4th 1059 (9th Cir. 2021). Following remand, Plaintiffs filed a second amended class action complaint, limiting the class to California consumers and the claims to those

24

arising under California law. 15-ER-3351 to 3420. Qualcomm filed a motion to dismiss, which the district court granted in part and denied in part. In dismissing Plaintiffs' tying and refusal to deal claims, the district court exclusively relied on the Ninth Circuit's decision in *FTC v. Qualcomm Inc.*, even though that case had construed federal Sherman Act claims rather than claims under California law. *See* MTD Order (1-ER-0019 to 0055). The district court did not grant Qualcomm's motion to dismiss with respect to exclusive dealing, and permitted that to proceed on the merits. *Id*.

Qualcomm promptly filed a motion for summary judgment in April 2023. 13-ER-2926 to 2956. In response to the summary judgment motion, Plaintiffs filed a supplemental expert report from Dr. Flamm that focused on quantifying harm arising solely from the exclusive dealing claims remaining in the case. *See* 8-ER-1557. Plaintiffs also proffered the previous expert reports of Prof. Einer Elhauge, which had already been used in the litigation prior to remand. *See* 13-ER-2957 to 3073 (Elhauge Report); 14-ER-3075 to 3263 (Elhauge Rebuttal Report). The district court declined to consider Plaintiffs' supplemental expert report, however, granting Qualcomm's motion for summary judgment. 1-ER-0004 to 0018.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's decision granting a motion to dismiss, assuming the truth of the allegations in the complaint, and drawing all

25

reasonable inferences in the plaintiff's favor. *See Winter ex rel. U.S. v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1119 (9th Cir. 2020).

The standard of review on an appeal from a grant of summary judgment is also *de novo*. *See Botosan v. Paul McNally Realty*, 216 F.3d 827, 830 (9th Cir. 2000). The appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether any genuine issues of material fact exist, and whether the district court correctly applied the relevant substantive law. *See Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (*en banc*). At summary judgment, "[t]he evidence of [respondents] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

In the antitrust context, the summary judgment standard becomes "even more strict." *Calnetics Corp. v. Volkswagen of Am., Inc.*, 532 F.2d 674, 683 (9th Cir. 1976); *see also Corwin v. L.A. Newspaper Serv. Bureau, Inc.*, 4 Cal.3d 842, 855 (1971) ("Whether a restraint of trade is reasonable is a question of fact to be determined at trial."); *Poller v. Columbia Broad.*, 368 U.S. 464, 473 (1962) ("summary procedures should be used sparingly in complex antitrust litigation").

Discovery sanctions are reviewed for abuse of discretion. *Trujillo v. C'nty of L.A.,* 751 F. App'x 968, 970 (9th Cir. 2018).

26

## ARGUMENT

I. **The Court Should Certify Questions TO THE CALIFORNIA SUPREME COURT AS To Qualcomm's Liability Under California LAW**

This Court should certify to the California Supreme Court three important

questions regarding California law that are not addressed under clear and

controlling precedent and that may be determinative of the case:

1. Does California antitrust law follow federal antitrust law, as set forth in *FTC v. Qualcomm*, 969 F.3d 974 (9th Cir. Aug. 11, 2020), in barring Appellants' various claims for relief against Qualcomm?

2. Is forcing OEMs to accept supra-FRAND (Fair, Reasonable, and Non-Discriminatory) licenses in a tied market for Standard-Essential Patents by using market power in the market for tied chipset products (both CDMA and Premium LTE) actionable under the Cartwright Act (Cal. Bus. & Prof. Code §§ 16700 *et seq*.) and Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq*.) if the alleged conduct involves direct harm to the defendant's customers, and allegations of harm to its competitors?

3. Under the Cartwright Act and the UCL, may higher consumer prices and economic harm to OEMs be considered "anticompetitive in the antitrust sense," even if they do not involve restraints on trade or exclusionary conduct in "the area of effective competition," as stated in *FTC v. Qualcomm*?

4. Does liability for exclusive dealing arrangements with OEMs under the Cartwright Act and Unfair Competition Law depend on a "pass-through" analysis of antitrust injury for each affected market (*e.g.*, CDMA and "premium LTE"

27

chipset markets) when a plaintiff presents evidence that the
exclusive dealing arrangements both increased chipset
prices paid by OEMs for chipsets and caused damages to
the California indirect purchaser class?

**A.    Certification Standard**

Federal Circuit Courts of Appeals may in their discretion certify questions of

California law to the California Supreme Court under the following conditions:

> (1)    [t]he decision [of the question] could determine the outcome
> of a matter pending in the requesting court; and

> (2)    [t]here is no controlling precedent.

*See* California Appellate Rule 8.548. The California Supreme Court, in exercising

its discretion to certify, may consider "whether resolution of the question is

necessary to secure uniformity of decision or to settle an important question of law,

and any other factor the court deems appropriate." *Id.*

The Ninth Circuit considers the following factors when deciding to certify

issues to a state's highest court:

> (1)    whether the question[s] present[] important public policy
> ramifications yet unresolved by the state court;
> (2)    whether the issue[s] [are] new, substantial, and of broad
> application;
> (3)    the state court's caseload; and
> (4)    the spirit of comity and federalism.

*Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 939 F.3d 1045, 1048 (9th Cir. 2019)

(cleaned up).

28

Certification is particularly appropriate where, as here: the issues of law are "complex and have significant policy implications," *McKown v. Simon Prop. Grp. Inc.*, 689 F.3d 1086, 1091 (9th Cir. 2012) (cleaned up); *Barnes-Wallace v. City of San Diego*, 607 F.3d 1167, 1170 (9th Cir. 2010) (seeking certification where case raised difficult questions of state law with broad implications); the state law issues will have "profound legal, economic, and practical consequences" throughout California, and will be "outcome-determinative for many disputes in state court and the Ninth Circuit," *Mendoza v. Nordstrom, Inc.*, 778 F.3d 834, 841 (9th Cir. 2015); and "comity and federalism counsel that the California Supreme Court, rather than [the federal court], should answer the certified question." *Vazquez*, 939 F.3d at 1048-49 (citation omitted).

These factors are met here. The policy implications for California markets of questions regarding the scope of liability for anticompetitive conduct are clear, as are the comity interests implicated by California's interest in protecting its consumers. *See Vazquez*, 939 F.3d at 1048-49. Indeed, District Judge Corley herself acknowledged that these issues might be suitable for certification to the state's highest court, noting that she "felt constrained because I'm not supposed to predict changes of the law" and that perhaps the Ninth Circuit would "boot the question over to the California Supreme Court." *See* 2-ER-0057 (8/3/23 Transcript of MSJ Hearing) at 24:21 - 25:1.

29

Fundamental differences between California and federal antitrust law mean that the California Supreme Court would not follow this Court's decision in *FTC* in discounting the anticompetitive harm from increased prices for consumers and Original Equipment Manufacturers. The principal goal of California's Cartwright Act is the "preservation of consumer welfare," *Cipro*, 61 Cal.4th at 136. *Compare, e.g.*, *FTC*, 969 F.3d at 992 (higher consumer prices and economic harm to OEMs, "even if real, are not 'anticompetitive' in the antitrust sense—at least not *directly*— because they do not involve restraints on trade or exclusionary conduct in 'the area of effective competition'") *with Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*, 55 Cal.App.4th 381, 418 (2020) ("direct evidence of anticompetitive effects" includes "increased prices"); *see also Feldman v. Sacramento Bd. of Realtors, Inc.*, 119 Cal.App.3d 739, 748 (1981) ("the purpose of antitrust laws is *primarily* to protect the *consuming public* by healthy competition") (emphasis added).[3]

Similarly, existing California caselaw indicates that the California Supreme Court would not immunize practices from antitrust scrutiny that raise rivals' costs

---

[3] Indeed, the Ninth Circuit itself has since abandoned the reasoning of the *FTC* decision. *See, e.g.*, *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1112 (9th Cir. 2021) ("proof of actual detrimental effects on competition, such as reduced output, *increased prices*, or decreased quality in the relevant market" constitutes "direct" evidence of anticompetitive harm) (emphasis added).

30

through a combination of tying and exclusive dealing—and thus insulate a

defendant from competition and price pressure—merely because the

anticompetitive conduct involved the assertion of patent rights and potential

breaches of contractual obligations outlining those patent rights. *See, e.g., Cipro*,

61 Cal.4th at 136 (the Cartwright Act's principal goal is the "preservation of

consumer welfare"). Indeed, this is complex issue on which many antitrust

scholars have disagreed. The Ninth Circuit's decision in *FTC* affirmatively staked

out is position on this debate; but the California Supreme Court would likely reach

a contrary result under California law.

### B. Certifying Questions of whether Qualcomm's Tying and Exclusive Dealing Violates the Cartwright Act Is Warranted

California antitrust law is different than federal antitrust law—both before,

but especially after, the Ninth Circuit's decision in *FTC v. Qualcomm*. As

California courts have long held, the Carwright Act is "broader in range" and

"deeper in reach" than the Sherman Act. *Cellular Plus, Inc. v. Super. Ct.* (1993)

14 Cal.App.4th 1224, 1242; *Aryeh v. Canon Bus. Sols., Inc*., 55 Cal.4th 1185, 1195

(2013) ("[i]nterpretations of federal antitrust law are . . . not conclusive . . . when

construing the Cartwright Act").[4]

---

[4] *See also Samsung v. Panasonic*, 747 F.3d 1199, 1205 n.4 (9th Cir. 2014)
(holding that it was reversible error to dismiss a Cartwright Act claim on the

The question of whether the *FTC* decision limits the reach of California's Cartwright Act and Unfair Competition law concerning claims of anticompetitive conduct based on FRAND obligations is an important question concerning California law, with broad policy and consumer protection implications for the state. *See Vazquez*, 939 F.3d at 1048. The California Supreme Court should thus have the opportunity to weigh in on the issue, and it is unlikely that the State of California would follow the *FTC* approach in assessing the intersection of patent and antitrust law under the Cartwright Act. Such reasoning applies *a fortiori* to the UCL, as that statute is even broader in scope than the Cartwright Act. *See Aryeh*, 55 Cal.4th at 1195, 1196; Section I.C. *infra*.

In fact, the California Supreme Court has already indicated it would likely not agree with the *FTC* decision that "the remedy for breaching a FRAND commitment" necessarily rests in "contract and patent law," and does not implicate "antitrust liability." *FTC*, 969 F.3d at 1005. In *Cipro*, for example, the California Supreme Court held that "abuse of patent rights [could] . . . run afoul of antitrust law" under the Cartwright Act, and rejected the "scope of the patent test," as it insulates from antitrust scrutiny "virtually any agreement that restrains trade no

_____

grounds that "interpretation of California's antitrust statute [was] coextensive with the Sherman Act"—as that was not the law in California).

32

more than the patent itself would have, if valid." *In re Cipro Cases I & II*, 61 Cal.4th 116, 145 (2015). *Cipro* held, rather, that the Cartwright Act's method of analysis for assessing anticompetitive harm from restraints related to patent rights "[was] *not materially different* from that applied in any other garden-variety antitrust case." *Id.* (emphasis added).

This Court should not simply assume that the California Supreme Court would apply the reasoning of the *FTC* decision in deciding whether Plaintiffs' tying or exclusive dealing claim violated California antitrust and unfair competition law. Interpreting the application, if any, of a Sherman Act ruling to the California Cartwright Act has "significant implications" for California's antitrust and unfair competition laws, warranting decision by the state's highest court. *See Mineral C'ty v. Walker River Irrigation Dist.*, 900 F.3d 1027, 1034 (9th Cir. 2018). That is particularly true when, as here, state law precedent conflicts with the legal principles set forth in the *FTC* decision.

The *Cipro* decision shows there is no reason to think that the California Supreme Court would follow the Ninth Circuit's approach to tying in *FTC v. Qualcomm*. *See Cipro*, 61 Cal.4th at 145. *Cipro* provides evidence that the California Supreme Court would find unlawful tying where the "tied" product includes an agreement not to challenge a Standard Essential Patent. *See id.* Indeed, at the motion to dismiss stage, Plaintiffs argued that *Cipro* governs their

33

tying claim under Cartwright. In its decision on Qualcomm's Motion to Dismiss the Second Amended Complaint, however, the district court found that *Cipro* did not control the decision on Plaintiffs' Cartwright Act claims, and the district court reverted to this Court's analysis construing *federal law*:

> Plaintiffs argue *Cipro* stands for the proposition that 'abuse of patent rights may also run afoul of antitrust law.' [*In re Cipro Cases I & II*, 61 Cal.4th 116, 145 (2015)] . . . . That is true. *Cipro* applied a general antitrust violation—paying rivals not to compete in exchange for a share of the monopoly profits—to the patent context. But a *Cipro* violation is not formally alleged here. *Cipro* concerns horizontal restraints (between competitors) in the patent context, not a vertical (seller-customer) agreement.

1-ER-0019 ("MTD Order") at 18. The district court declined to apply *Cipro*, finding that Plaintiffs' Cartwright claims were "novel." 2-ER-0192 (Transcript at Motion to Dismiss) at 31:3-11. This Court should thus either find *Cipro* controlling, and Plaintiffs' Cartwright tying claims well-pleaded under *Cipro*, or that there is no controlling case on point, and certify the question for the California Supreme Court to answer in the first instance. *See* Cal. App. R. 8.548.

## C. Certifying Questions whether Qualcomm's Tying and Exclusive Dealing Violates the UCL Is Warranted

Deference to the California Supreme Court is perhaps even more appropriate for Plaintiffs' claims under the UCL. This is because the UCL, unlike the Cartwright Act, creates a broad equitable standard, and imposes sweeping

34

prohibitions against myriad unfair, unlawful, or fraudulent business acts or practices, of whatever form. *See* Cal. Bus. & Prof. Code § 17200 *et seq.*; *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999); *Aryeh*, 55 Cal.4th at 1195, 1196 (2013) ("the UCL is a chameleon" affording relief from "unlawful, unfair, or fraudulent acts"). It does not make sense that a competition law intended to be broader and more flexible than antitrust statutes (i.e., California's UCL) would have the exact same boundaries as those statutes (the federal Sherman Act)—the California Supreme Court should at least have the opportunity to weigh in on whether that counter-intuitive outcome is in fact correct.

In enacting the UCL, the California Legislature sought to protect "*both consumers and competitors*" by promoting "fair competition in commercial markets for goods and services." *Kwikset Corp. v. Sup. Ct.*, 51 Cal.4th 310, 320 (2011) (emphasis added). The UCL thus authorizes courts to use their equitable power to combat novel or varied or forms of unfair practice "run[ning] the gamut of human ingenuity and chicanery." *People ex rel. Mosk v. Nat'l Research Co.*, 201 Cal.App.2d 765, 772 (1962).

The UCL was originally enacted to enforce basic rules of "common honesty and accepted business ethics." *Hesse v. Grossman*, 152 Cal.App.2d 536, 540 (1957). The current version of the statute extends to consumer protections that

35

were once afforded only to direct competitors. *See Barquis v. Merch. Collection Ass'n*, 7 Cal.3d 94, 109 (1972). "With passage of time and accompanying epochal changes in industrial and economic conditions, *the legal concept of unfair competition broadened appreciably*, partly by the flexibility and breadth of relief afforded by equity, and partly by changing methods of business and changing standards of commercial morality." *People ex rel. Mosk v. Nat'l Research Co. of Cal.*, 201 Cal.App.2d 765, 770 (1962) (emphasis added).

Certification of questions regarding whether Qualcomm's tying and exclusive dealing violate the UCL is particularly appropriate given that the statute was designed to proscribe anticompetitive effects that do not necessarily fall within the letter of the antitrust laws themselves:

> The broad equitable reach of the UCL [was] expressly designed to allow a trial court to find a UCL violation where it finds *anticompetitive effects but not necessarily a violation of the antitrust laws* . . . . [T]he California Legislature specifically intended for the UCL to empower courts with broad equitable authority to redress schemes that 'violate the fundamental rules of honesty and fair dealing.'

*Barquis*, 7 Cal.3d at 112 (emphasis added); *see also Korea Kumho Petro. v. Flexsys Am., LP*, No. C07-01057 MJJ, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11, 2008) ("[a]n act need not violate the antitrust laws to be actionable by a competitor as unfair"); *MGM Studios, Inc. v. Grokster*, 269 F. Supp. 2d 1213, 1227 (C.D. Cal.

2003) (the UCL "arguably brings within its radius conduct that might otherwise fall outside the strict confines of antitrust law"). As the California Supreme Court explained in *Cel-Tech*, the UCL may reach conduct that "violates the policy or spirit" of the antitrust laws, even if there has not been an evidentiary showing sufficient to make out a formal antitrust violation. 20 Cal.4th at 187.

California's special interest and expertise in defining and developing its public policy via the UCL makes it appropriate for its highest court to remain the foremost authority on the scope and interpretation of the legislation in regards to anticompetitive harm. *See Lozano v. AT&T Wireless Services, Inc.*, 504 F.3d 718, 736 (9th Cir. 2007). Certification of these questions is therefore appropriate.

## II. The District Court Abused Its Discretion by Refusing to Consider Plaintiffs' Supplemental Expert Report

### A. Plaintiffs' Expert Supplemented His Report Not Because of a Change in Strategy—but a Change in the Law

The district court was concerned that Plaintiffs not be permitted to use supplementation to make up for any "strategic" errors in prosecuting the case. 2-ER-0057 (Transcript at Motion for Summary Judgment) at 15:9 ("Litigation often involves strategic choices."). But Plaintiffs did not submit a supplemental report due to their own failure to anticipate their adversary's strongest arguments or defenses. Plaintiffs instead sought to supplement their expert's prior report because *FTC v. Qualcomm* changed the governing law of the case. *Compare FTC*,

37

969 F.3d 974 *with In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948. *FTC* remains a minority decision that this Circuit has not relied upon since; Plaintiffs should not be punished with dismissal for not foreseeing such a change. *See Dukes v. Wal-Mart Stores, Inc.*, No. C-01-02252-CRB, 2012 WL 4329009, at *3 (N.D. Cal. Sept. 21, 2012) ("Plaintiffs cannot . . . be faulted for failing to anticipate a significant development in the Supreme Court's class-action jurisprudence" in seeking to re-open discovery).[5]

Holding parties accountable for the consequences of their own choices in prosecuting a case is one thing—but a change in the law is not a choice. The ability of litigants to make any "strategic choices" at all relies on the existence of some stability in (and reliance on) the governing law. Plaintiffs should be entitled to rely on the "law of the case" as it stood at the time of their original merits expert reports. And the "law of the case" at the time of the original expert reports was that all of Plaintiffs' claims remained actionable—a holding that was later found not to be the case, at least as it related to federal law.

---

[5] The district court's citation of *Luke v. Fam. Care & Urgent Med. Clinics*, 323 F. App'x 496, 500 (9th Cir. 2009) misses the point. *See* ER__ at 5:17-21. Plaintiffs did not seek supplementation because they had made strategic missteps, or because they had been out-maneuvered by their opponents, or because they needed to "revise [their] disclosures in light of their *opponent's challenges* to the analysis and conclusions"—Plaintiffs sought supplementation because *FTC v. Qualcomm* changed the governing law. *Id.* (emphasis added).

38

The district court was also concerned that considering the Supplemental Report of Dr. Flamm here would "open the flood gates to prolonged do-over litigation." 2-ER-0057 to 0095 at 15:16. But the circumstances here represent no such risk. There is no prolongation, as fact discovery is unaffected. And there would be no "flood" because admission here would set no precedent reaching beyond similar situations: *i.e.*, cases in which major mid-stream changes in legal precedent require separating viable theories of antitrust damages (such as exclusive dealing) from recently nullified ones (such as tying using Standard Essential Patents). Such instances will be rare, because of the principle of *stare decisis*.

If antitrust litigants are not permitted to limit their expert reports regarding antitrust injury based on what the current law *is*, but are instead subject to dismissal if they fail to predict how the law *might* change in the future, expert discovery under Rules 26 and 37 will become even more protracted and expensive for the parties. Expert reports will become unwieldy, confusing, and onerous to produce if experts are not able to limit their analyses based on the law of the case at the time, and are instead required to account for every conceivable form of antitrust injury, including those based on disfavored or overruled decisions. Consider the instant case: under the district court's reasoning, Plaintiffs should have proffered expert opinions on every possible permutation of their original multiple interrelated theories of antitrust harm, even though absent a change in the

39

law much of that analysis would be irrelevant. That cannot be what litigation requires.

Indeed, for exactly this reason—and as Plaintiffs argued below—courts permit supplementation of expert reports after remand from an appellate court, where that appellate court has clarified the law or altered it in a way significant to the case.  5-ER-0870 to 0901 at 10; *see Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 277 (1988) (expert reports in class action litigation are routinely tailored to events occurring in the course of litigation); *Glaberson v. Comcast Corp.*, 295 F.R.D. 95, 98, 100-02 (E.D. Pa. 2013) (permitted the parties to tailor their expert reports to remaining claim upon remand).

Plaintiffs also cited to *City of Vernon v. S. California  Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992) for this proposition; the district court found the case inapposite, stating that the case did not hold that a party has the right to "redo merits expert discovery after the deadline has passed," and "merely recited [that] the plaintiff's failure to request supplemental expert discovery weighed against the plaintiff's appeal."  1-ER-0009.  But Plaintiffs have not sought to completely "*redo*" expert discovery; Plaintiffs have requested, rather, to supplement a single expert report (based on the *existing* record evidence) to the limited extent required by an intervening change in antitrust law that shifted the terrain of viable theories of antitrust injury.  In any event, the district court did not explain, if the *Vernon*

40

court would not have considered supplemental expert discovery anyway, why that court would then see plaintiff's failure to *request* supplementation as "weigh[ing] against [its] appeal." The law does not require a futile act. *Ohio v. Roberts*, 448 U.S. 56, 74 (1980).

The district court also stated that it partly based its exclusion decision on Federal Rule of Civil Procedure 1. *See id.* ("[The Rules of Civil Procedure] should be construed, administered, and employed by the court and the parties to secure the *just, speedy, and inexpensive* determination of every action and proceeding.") (emphasis added); 2-ER-0057 at 15:14-16. While exclusion of the report might have been considered "speed[ier]," it was not "just." Fed. R. Civ. P. 1. And proceedings will be *more* "[]expensive," not less, if parties now have to engage experts to develop measures of antitrust damages based on every conceivable combination of each alleged antitrust harm, or even all in isolation—on the off chance the law might change mid-litigation. *Id.*

## B. The Supplemental Expert Report Was Based on Evidence Already in the Record

The Supplemental Expert Report did not tread new ground insofar as the record fact evidence is concerned. Indeed, as the Report itself demonstrates, Dr. Flamm's analyses and conclusions all relied on evidence that had been accumulated during the discovery period in the case. Moreover, his pass through

41

analysis remained unchanged since his initial report because the analysis is limited to the degree of cost pass through at the OEM level of the distribution chain. *See, e.g.,* 14-ER-3264 to 3280. And OEMs don't care whether the "cost" they are passing on is a result of anticompetitive tying, exclusive dealing, or some other increase in their input costs.

### C. The District Court Failed to Make Adequate Findings on Whether the Lack of Prior Disclosure was "Substantially Justified" or "Harmless"

Even if the district court acted within its discretion to preclude further supplementation of expert opinion, it erred by excluding the Supplemental Report of Dr. Flamm—which, as noted, was based solely on evidence already in the record—without making findings that lesser sanctions under Fed. R. Civ. P. 37 would be inadequate and without making adequate findings whether the lack of prior disclosure was "substantially justified" or "harmless." Fed. R. Civ. P. 37(c); *see Liberty Ins. Corp. v. Brodeur*, 41 F.4th 1185, 1190-92 (9th Cir. 2022) (courts cannot impose sanctions under Fed. R. Civ. P. 37(c)(1) without first considering "whether the defects in disclosure were harmless or substantially justified.").

### D. The District Court Failed to Make Requisite Findings Whether Lesser Sanctions Would Be Adequate to Cure Any Prejudice

Exclusion of Dr. Flamm's Supplemental Report was tantamount to dismissal of the action; the district court thus had to provide greater justification for the

42

sanction of excluding the supplemental expert evidence. *See R&R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1247 (9th Cir. 2012) (where discovery sanction amounts to dismissal of claim, district court must consider availability of lesser sanctions, and make "requisite findings" about the availability of those sanctions).

Dismissal is a severe sanction that undermines the policy favoring the decision of cases on the merits. *See Falk v. Allen*, 739 F.2d 461, 463 (9th Cir. 1984). Rule 37 sanctions are subject to certain limitations in that they "must be just"; discovery sanctions are not "just" if their severity is unwarranted by the conduct involved. *U.S. v. Nat. Med. Enters., Inc.*, 792 F.2d 906, 910 (9th Cir. 1986).

The district court made no finding that its consideration of the Supplemental Report would subject Qualcomm to unfair surprise. Indeed, Qualcomm had been aware of Plaintiffs' theory of chip overcharge for years; all that the Supplemental Report did was use the existing record evidence to isolate and quantify the antitrust injury caused by that overcharge, and the impact of Qualcomm's exclusive dealing conduct (under California law) on the putative class of California indirect purchasers. In a previous iteration of Plaintiffs' expert work, they had quantified the aggregate effect of all of the alleged anticompetitive practices (supra-FRAN pricing in violation of SEP commitments, tying in the form of no license no chips, duty to deal, and exclusive dealing), which was entirely reasonable given that the

43

district court had originally (prior to this Court's decision in *FTC*) expressly upheld such claims. *In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948.

The district court also failed to make findings as to why lesser sanctions would be inadequate. *See Merchant v. Corizon Health, Inc.*, 993 F.3d 733, 741-42 (9th Cir. 2021) ("When a district court excludes case-dispositive evidence under Rule 37(c)(1), it must consider lesser sanctions as part of its 'harmlessness inquiry.'"); *U.S. v. $11,500.00 in U.S. Currency*, 710 F.3d 1006, 1011 (9th Cir. 2013) ("A district court abuses its discretion if it . . . fails to consider the factors relevant to the exercise of its discretion.") (citation omitted); *Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1027 (9th Cir. 2000). The district court, for example, did not explain why it could not have allowed Qualcomm to re-depose Dr. Flamm on the contents of the Supplemental Report, or to submit a rebuttal expert report addressing Dr. Flamm's supplemental opinions, or both. *See id.*

The district court failed to provide findings as to why the above remedies— i.e., re-deposing Plaintiffs' expert; submission of a competing expert supplemental report etc.—could not be utilized to address the change in the law from *FTC v. Qualcomm* t. *See* 1-ER-0004 (MSJ Order) at 6. Nor did the district court make requisite findings assessing whether other similar measures would be sufficient to cure any prejudice to Qualcomm. *See id.*; *R&R Sails*, 673 F.3d at 1247.

44

Indeed, Qualcomm itself had indicated it was *not* harmed by such limited measures, given the changed circumstances of the case. *See*, *e.g.*, 2-ER-0169 to 0191 (CMC Joint Statement) at 16:9–13 ("[i]f this Court permits this case to proceed, Qualcomm *agrees* that *further expert discovery will be required*"; "Qualcomm agrees that expert discovery would be necessary . . . .") (emphasis added). These statements belie any claim of prejudice, and judicially estop Qualcomm from taking a contrary position now. Nor did the district court make findings that permitting this limited expert supplementation would lead to undue delay, or interfere with the trial schedule; as Plaintiffs stated, any delay would be minimal, as the supplemental report would require gathering no new data or other record evidence. *See Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506 (9th Cir. 1985) (finding damages report offered at summary judgment stage to be "flawed" but permitting claim to proceed, because "the data already existed[,] even though it had not yet been placed in the proposed damage report").

### E. The District Court Failed to Make Requisite Findings of Willfulness, Fault, or Bad Faith

Nor did the district court make "requisite findings" showing that Plaintiffs' proffer of the Supplemental Expert Report resulted from "willfulness, fault, or bad faith." *See R&R Sails*, 673 F.3d at 1247 (the district court must make "requisite

45

findings" as to whether the claimed noncompliance involved "willfulness, fault, or bad faith").

Although district courts have considerable discretion to impose Rule 37 remedies, sanctions tantamount to dismissal are authorized only in extreme circumstances. *See U.S. for Use of Wiltec Guam v. Kahaluu Constr.*, 857 F.2d 600, 603 (9th Cir. 1988); *Comput. Task Gr., Inc. v. Brotby*, 364 F.3d 1112, 1115 (9th Cir. 2004) (where terminal sanctions such as dismissal are imposed, "the range of discretion is narrowed"). Sanctions amounting to dismissal are warranted only if the violation is due to willfulness, bad faith, or the fault of the party—none of which were found by the district court here. *See id.*; *U.S. v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365, 1369 (9th Cir. 1980) (dismissal, or preclusion of evidence tantamount to dismissal, may be imposed only where the party's failure is due to willfulness, bad faith, or fault). Nor did the district court make any findings that Plaintiffs' late disclosure was the result of gamesmanship, or disregard for the court's directives.

## III. The District Court Disregarded Triable Issues of Fact Showing that Qualcomm's Exclusive Dealing Violated the Cartwright Act and UCL

Compounding the forgoing errors, the district court also failed to credit undisputed evidence presented by Plaintiffs showing that: Qualcomm's exclusive dealing arrangements with Apple created an anticompetitive market for modem

46

chips; those exclusive deals delayed the ability of Intel (and other chip manufacturers) to compete by at least two years; and that those exclusive arrangements effectively eliminated competition during that time.

## A. Plaintiffs Showed Triable Issues of Fact regarding Antitrust Injury

The district court erred in finding that Plaintiffs had not presented evidence showing the "practical effect of exclusivity." 1-ER-0004 (MSJ Order) at 9:8-28; citing *Fisherman's Wharf Bay Cruise Corp. v. Sup. Ct.*, 114 Cal.App.4th 309, 335-38 (2003). Plaintiffs presented the following undisputed evidence, for example, showing how Qualcomm's exclusive deals impeded the competitive process for rival chipset manufacturers: 12-ER-2827 (Blevins Dep.) at 65:23-66:14; 105:15-106:5 (Apple executive listing the advantages of a multi-source scenario over exclusivity); *id.* at 108:8-21; 108:23-109:4; 109:14-111:14 (Blevins stating that his

██████████████████████████████████████████

██████████████████ ; *id.* at 112:10-113:2 (stating that the exclusive arrangements ███████████████████████████████████

██████████████████████ *id.* at 116:15-117:4 (stating that, but for Apple's exclusive dealing with Qualcomm for chipsets, Apple ████████

██████████████████████████████████████████

██████████████████████████████████████

███████████████; *see also* 12-ER-2857 (Mahe II) at 232:21-233:19; 12-ER-2623 (PX356, APL-WC-FTC_02113566 (Apple email dated Dec. 3, 2013)(stating disappointment with ███████████████████████); 12-ER-2857 (Mahe II) at 230:7-12.

The reports (both the opening and rebuttal) of Plaintiffs' expert Einer Elhauge—which are indisputably part of the record as they were submitted during the original district court proceedings— also showed that Qualcomm's exclusive dealing caused antitrust injury and impact. *See* 13-ER-2957 to 3073 (Elhauge Report); 14-ER-3075 to 3263 (Elhauge Rebuttal Report). Professor Elhauge's original merits report, submitted on October 26, 2018, found, for example, that Qualcomm's exclusivity arrangements "anticompetitively increased both chip prices and SEP royalty rates," and had "the anticompetitive effect of reducing, delaying, and sometimes outright eliminating the ability of rival chipset makers to compete with and restrain the monopoly power of Qualcomm in chipsets." *Id.* The analyses contained in the Elhauge expert reports, by themselves, should have been sufficient for denying summary judgment on Qualcomm's motion.

**B. Plaintiffs Showed Triable Issues of Fact Regarding Market Foreclosure**

The district court also overlooked Plaintiffs' evidence showing that Qualcomm's exclusive deals with Apple and Samsung foreclosed competition in a

substantial share of the market.  1-ER-0004 (MSJ Order) at 10-11.  In assessing the

degree of market foreclosure necessary, "courts must consider any . . . existing

unique market factors which bear on the degree of residual competition between

the parties remaining after the exclusive arrangements."  *Fisherman's Wharf*, 114

Cal.App.4th at 336, 339 (denying summary judgment based on evidence of market

foreclosure of only 20 percent).

Plaintiffs, for example, presented undisputed evidence that Apple and

Samsung were the most important customers in the market due to their size—█

█████████████████████.  12-ER-2822 (Mollenkopf) at 15:4-13.  It was also

undisputed that it was critical for chipset manufacturers to partner with Apple and

Samsung, as those engagements led to greater innovation.  *See id.*  Losing Apple

and Samsung as customers hindered Qualcomm's competitors and put them at a

disadvantage.  *See id.*  Qualcomm understood this, ████████████████████████

█████████████████.[6]

---



Plaintiffs also presented an August 2010 email in which Steve Mollenkopf,
then-President of Qualcomm's chipset division, told Qualcomm's then-CEO, Paul
Jacobs, President Steve Altman, and Licensing Division President Derek Aberle
that, ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████. 12-
ER-2626 (Q2017MDL1_ 00477261). Qualcomm recognized that the TA could
████████████████████████████████████████████████████████
████████████████████. *See id.*

Plaintiffs' evidence showed that Qualcomm recognized that, as modem chip
suppliers became more competitive, they were able to sell modem chips to Apple.
For example, a 2012 Qualcomm presentation shared with the Qualcomm Board of
Directors identified ██████████████████████████ 12-ER-2630
(QNDCAL 01051173); 12-ER-2632 (QNDCAL01051174) at -199. In that
presentation, Qualcomm stated that ██████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

50

 *See id.* at -200.  Intel's

Stefan Wolff explained in an email that ███████████████████████████

███████████████████████████████████████████████████

██████████████████████████. 12-ER-2618 (INTELQCOM

000573550). ███████████████████████████████████████

███████████████████████████ *See id.*

The district court also failed to acknowledge that Plaintiffs had presented

evidence showing triable issues of fact about whether the nature of Qualcomm's

coercive exclusive dealing arrangements foreclosed Apple from considering

competitors in the first instance. Plaintiffs presented evidence, for example,

showing that due to the substantial financial penalties for disloyalty to Qualcomm

(over $2 billion), Apple ███████████████████████████████████

██████████████████████████████. 8-ER-1764

(FTC-PROD-0012101) at pp. 3-4; *see also* 12-ER-2813 (APL-QCFTC_ 17910720

(2014 email from Apple's VP of Procurement stating that ██████████████

███████████████████████████████████████████).

Plaintiffs' evidence also showed under California law that Qualcomm used

its profits from the supra-FRAND royalties it obtained to offer what Qualcomm

called ████████████████████ to OEMs, in exchange for exclusivity or

near-exclusivity.  8-ER-1557 (Flamm Supp. Report) *et seq.*; *see also* 13-ER-2957

(Elhauge Report) ¶¶ 127-135. Although Qualcomm called these payments

██████████████████, they were ██████████████████████████

████████  8-ER-1557 ¶¶ 10-14, 16, 73, 153 (emphasis added).

Contrary to the decision below, Plaintiffs' claims do not depend on an

allegation that Qualcomm charged "ultralow" prices for its chipsets. Rather,

Plaintiffs' Second Amended Complaint alleged that the combination of

Qualcomm's "No License, No Chips" tie and its exclusive dealing arrangements

raised rivals' costs, and thereby insulated Qualcomm from competition and price

increases, in both the "tying" and the "tied" markets.

## IV. The District Court Erred in Dismissing Plaintiffs' Tying Claims Under California Law

### A. Plaintiffs Stated a Claim for Tying Claims under the Cartwright Act

The district court erred in granting Qualcomm's motion to dismiss Plaintiffs'

tying claim. The district court erroneously found that Plaintiffs failed to plead

foreclosure due to the tie. The district court incorrectly relied on *Morrison v.*

*Viacom*, 66 Cal.App.4th 534, 539 (1998), but that case makes clear that, while

alleging foreclosure in the market for the tied product is one option for stating a

tying claim under the Cartwright Act, it is not a required element, and a plaintiff

can also state a Cartwright Act claim by alleging, as Plaintiffs here did, that the

52

defendant had sufficient market power to coerce the purchase of the tied product. *See id.*

Plaintiffs alleged the elements required under *Morrison*. *See* 15-ER-3351 (citing 66 Cal.App.4th at 539). While *Morrison* lays out four elements by which a claim may be stated under California's tying statute, the case makes clear that not all four factors need be alleged. *See id.* Thus, the *Morrison* court states that, as to the elements listed below, "a *per se* violation [under the Cartwright Act] is established if *either* element (2) *or* (3) is established along with elements (1) and (4)":

> The elements of a *per se* tying arrangement violative of section 16720 are:
>
> '(1) a tying agreement, arrangement or condition existed whereby the sale of the tying product was linked to the sale of the tied product or service;
> (2) the party had sufficient economic power in the tying market to coerce the purchase of the tied product;
> (3) a substantial amount of sale was affected in the tied product; and
> (4) the complaining party sustained pecuniary loss as a consequence of the unlawful act.'

*Id.* at 541-42 (emphasis added). Plaintiffs alleged elements (1) and (4) above, and thus stated a claim by also alleging (2) ("the party had sufficient economic power in the tying market to coerce the purchase of the tied product"). 15-ER-3351 (CCAC) ¶¶ 54-89. Plaintiffs were not required to also allege (3) ("a substantial

amount of sale was affected in the tied product") in order to state a tying claim under the Cartwright Act. Dismissal was thus improper.

The district court followed similar reasoning to that used in *FTC v. Qualcomm* to dismiss Plaintiffs' tying claims under California law, but California caselaw suggest that the California Supreme Court would not follow the patent licensing analysis of the *FTC* decision. The district court stated, for example:

> [T]he *FTC v. Qualcomm* court held Qualcomm's SEP royalty pricing is a *question for patent law or contract law, not antitrust law.* The "no license, no chip" policy does not foreclose competition to buy Qualcomm's SEPs because there is no alternative seller. And the "no license, no chips policy" was chip supplier neutral—*i.e.*, Qualcomm required OEMs to buy licenses, regardless of who sold the chips to OEM. *So here, as in the FTC action, Qualcomm did not restrain competition to sell those SEPs through "no license, no chips" because there is no alternative seller for Qualcomm's SEPs.*

1-ER-0019 (MTD Order (CCAC)) at 28:5-18 (emphasis added). The district court was not convinced that *In re Cipro Cases I &II*, 61 Cal.4th 116 (2015) provided sufficient evidence that the California Supreme Court would find unlawful tying where the tied product included an agreement not to challenge a Standard Essential Patent. *Id.* at 30:19-20. To the extent that *Cipro* did not control the required elements of Plaintiffs' so-called "novel" tying claim, though, at a minimum, this Court should certify the question so that the California Supreme Court can provide

54

a definitive assessment of whether these facts are sufficient to state a tying claim under the Cartwright Act (or UCL).

Contrary to the decision below, Plaintiffs' allegations plausibly stated a claim in light of *Cipro*. *See* 61 Cal.4th at 145, 150. *Cipro* held that, under the Cartwright Act, the "scope of the patent test" was not the law in California, and that "abuse of patent rights [could] also run afoul of the antitrust law". *Id.* But that is precisely what has been alleged here—that is, that Qualcomm has abused its patent rights by violating its SEP FRAND commitments and by engaging in tying. *Cipro* held that an analogous "reverse payment patent settlement" agreement could give rise to antitrust liability under the Cartwright Act, because an "agreement to exchange consideration for elimination of any portion of the period of competition that would have been expected had the patent been litigated is a violation of the Cartwright Act." *Id.* at 150-51.

### B. Plaintiffs Stated a Tying Claim Based on Qualcomm's "No License, No Chips" Policy and Conduct

Putting aside patent law issues, Plaintiffs adequately alleged a tying claim based on Qualcomm's "No License, No Chips" policy and conduct under ordinary standards governing Cartwright Act tying claims. *See* 15-ER-3351 (CCAC) ¶¶ 2, 55, 58-60, 78-86. Plaintiffs alleged, as required, that Qualcomm had market power in the markets for the tying products and that Qualcomm coerced Original

55

Equipment Manufacturers to accept a supra-FRAND license in the tied market for

Qualcomm's Standard Essential Patents ("SEPs"). *See* 15-ER-3351 (CCAC) ¶¶ 2,

55, 58-60, 78-86. These allegations stated a plausible Cartwright Act claim, *see*

*Cipro*, 61 Cal.4th at 149, under the standard established by *Fisherman's Wharf* and

its progeny. *See* 114 Cal.App.4th at 336, 339.

California authorities explain that under the Cartwright Act, "[t]ying

arrangements are illegal *per se* whenever a party has sufficient economic power

with respect to the tying product to appreciably restrain free competition in the

market for the tied product." *Corwin v. L.A. Newspaper Serv. Bureau, Inc.*, 4

Cal.3d 842, 856 (1971). The Cartwright Act sets forth a different express statutory

framework for tying claims, and has a more liberal test for finding a violation than

does the Sherman Act. *See UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*, 169

Cal.App.4th 357, 369 (2008).

Plaintiffs stated a claim for an unlawful restraint of trade under the

Cartwright Act by pleading: "(1) a tying agreement, arrangement or condition . . .

whereby the sale of the tying product [or service] was linked to the sale of the tied

product or service; (2) the party had sufficient economic power in the tying market

to coerce the purchase of the tied product; (3) a substantial amount of sale was

effected in the tied product; and (4) the complaining party sustained pecuniary loss

as a consequence of the unlawful act." *Id.* Plaintiffs pleaded all of these elements. 15-ER-3351 (CCAC) ¶¶ ¶¶ 10-14, 16, 73, 153.

Instead of relying on California precedent, the district court blindly considered the *FTC* decision in assessing Plaintiffs' "No License, No Chips" policy, and *FTC* analyzed that policy in isolation from Qualcomm's other alleged conduct. 1-ER-0019 (MTD SAC) at 20:8-13; *see FTC*, 969 F.3d at 993. [7] But California courts assess conduct holistically under the Cartwright Act—California does not engage in this sort of piecemeal analysis. *See*, *e.g.*, *In re Automobile Antitrust Cases I & II*, 1 Cal.App.5th 127, 152 (2016), *rev. denied*, Oct. 19, 2016 (the "character and effect" of the defendant's conduct are not to be judged by "dismembering it and viewing its separate parts, *but only by looking at it as a whole"*) (emphasis added). The failure of the district court to consider

---

[7] *FTC v. Qualcomm* included the following findings regarding Qualcomm's "No License, No Chips" policy: (1) the policy "raise[d] the 'all-in' price that an OEM [had to] pay for modem chips (*i.e.*, chipset plus licensing royalties) regardless of which chip supplier the OEM [chose] to source its chips from"; (2) "whether that all-in price [was] reasonable or unreasonable [was] an issue that sound[ed] in patent law, not antitrust law"; and (3) "it involve[d] potential harms to Qualcomm's customers, not its competitors" and thus failed to show harm to competition "in the relevant antitrust markets." *FTC*, 969 F.3d at 1002. Considering Qualcomm's practices in the chipset markets in isolation, the panel found that the FTC had alleged that Qualcomm charged "ultralow prices on its own modem chips," but had not adequately alleged "predatory" or "below-cost" pricing. *Id.*

57

Qualcomm's conduct as a whole under the Cartwright Act was error, and should be reversed.

### C. Plaintiffs Stated a Tying Claim under the UCL

The district court erroneously dismissed Plaintiffs' tying claims under the UCL, finding that Plaintiffs had not shown reliance. *See* 1-ER-0019 (MTD Order) at 37:12-13 ("Plaintiffs are not Qualcomm's competitors. So, *because Plaintiffs fail to allege reliance* they lack standing to bring a UCL claim under the 'fraud' prong."). But Plaintiffs did not need to allege reliance, because the Second Amended Complaint did not involve claims of false advertising or misrepresentation to consumers. *See* 15-ER-3351 (CCAC). Plaintiffs only needed to allege a "causal connection" between Qualcomm's fraudulent conduct and the Plaintiffs' harm—which Plaintiffs did. *See Kwikset Corp. v. Super. Ct.*, 51 Cal.4th 310, 326 (2011). Plaintiffs adequately alleged that Qualcomm perpetrated a fraud that passed on billions of dollars in overcharges to Plaintiffs and other consumers. *See* ER__ ¶¶ 21-26, 76, 193, 199-213, 241.

//

//

### D. Plaintiffs' Tying Allegations Met All Tests for Unfairness under the UCL

#### 1. Plaintiffs Alleged Unfairness under the UCL "Balancing Test"

Plaintiffs first adequately alleged that Qualcomm's practices were unfair under the UCL balancing test, which asks whether the practice at issue "offends an established public policy or . . . is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers . . . weigh[ing] the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Brooks v. Bank of Am., N.A.*, No. 20-cv-01348-BAS-LL, 2021 WL 1541643, at *4 (S.D. Cal. Apr. 20, 2021). Qualcomm's allegedly unfair practices arose from its scheme to make voluntary FRAND commitments in order to obtain SEPs, and then systematically violate those commitments by coercing its customers to accept (or otherwise adhere to) supra-competitive, non-FRAND SEP licensing terms. *See* 15-ER-3351 (CCAC) ¶¶ 14-19, 42, 46-53, 227(h), (p), 249, 10 251(a)-(e), (g).

Qualcomm intentionally violated FRAND rules—despite making commitments to the contrary to be adopted as the standard—to reinforce its market dominance, and to extract billions of dollars in additional revenue, the costs of which were ultimately paid by consumers. *See id.* ¶¶ 1, 19-21, 76, 89, 128, 192-198, 212-213, 241. Qualcomm's practices offended public policy, were unscrupulous, and caused substantial injury to consumers, by undermining the

59

SSOs and the standard-setting process more generally, by harming competition and innovation in the modem chip and cellular device markets, by limiting consumer choice, and by causing Plaintiffs and class members to be overcharged hundreds of millions (or billions) of dollars, in the form of higher-priced and/or lower-quality cellular devices. *See id.* ¶¶ 1, 11, 21-26, 70, 193, 212-213, 241, 250(c); *see Kwikset*, 51 Cal.4th 310, 325, 323, 329-30 (noting the "innumerable" forms of possible UCL economic injury include "surrender[ing] in a transaction more, or acquir[ing] in a transaction less, than [plaintiff] otherwise would have", or having to pay an "overcharge").[8]

At the same time, Qualcomm's practices had no legitimate utility—*i.e.*, those practices may have accomplished Qualcomm's purpose of stifling competition and increasing revenue and market dominance, but provided no other benefit to markets, consumers, or society. *See* 15-ER-3351 (CCAC) ¶¶ 17, 70, 235, 240, 253. Any contrary factual findings by the *FTC* court based on a different evidentiary record compiled by different parties trying to prove different claims should not have been applied in assessing Plaintiffs' claims here.

---

[8] *See also Intel Corp. v. Fortress Inv. Grp. LLC*, *Brief of Amici Curiae Fair Standards Alliance*, No. 3:19-cv-07651-EMC, 2020 WL 1983487 (N.D. Cal. Mar. 19, 2020) (describing abuses of standard-setting process).

### 2. Plaintiffs Alleged Unfairness under the UCL "Tethering Test"

Plaintiffs' allegations also satisfied the UCL tethering test, which requires allegations of conduct that "threatens an incipient violation of an antitrust law, or *violates the policy or spirit of one of those laws* because its effects are comparable to or the same as a violation of the law, or *otherwise significantly threatens or harms competition*." *Cel-Tech*, 20 Cal.4th at 187 (emphasis added); *see also Lozano*, 504 F.3d at 735-36.

Plaintiffs satisfied this test by alleging that Qualcomm's practices: (1) violated the federal and state public policies of supporting the Standard Setting Organizations, which would cease to function if all Standard-Essential Patent holders behaved like Qualcomm in ignoring their FRAND commitments; policies requiring SEP holders to deal on a nondiscriminatory basis; and U.S. and California public policy supporting the SSOs, and the setting of international standards, 15-ER-3351 (CCAC) ¶ 249(a)-(c); (2) violated the policy and spirit of the Cartwright Act, and other California antitrust law and principles, *id.* ¶ 249(d); *see Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*, No. 15-CV-1576-AJB-RBB, 2016 WL 4087302, at *12-*13 (S.D. Cal. Aug. 1, 2016); (3) had effects that were the same as, or similar to, a violation of the Cartwright Act, *see id.* ¶ 250(b); (4) threatened an incipient violation of the Cartwright Act, *see id.*

61

¶ 250(a); and (5) significantly threatened and harmed competition in the relevant modem chip and cellular device markets, *see id.* ¶ 250(c).

### 3. Plaintiffs Alleged Unfairness under the UCL "Consumer Injury" Test

Plaintiffs' allegations also satisfied the third balancing test for unfairness under the statute, *i.e.*: "(1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." *Camacho v. Auto. Club of S. Cal.*, 142 Cal.App.4th 1394, 1403 (2006). As to *Camacho* factors (1) and (2), Plaintiffs' unfairness allegations were adequate for the same reasons they satisfied the first balancing test above. *See supra* at 57. As to factor (3), consumers could not reasonably have avoided the overcharges and other injuries to competition, innovation, and consumer choice alleged in the SAC, because Qualcomm had "entered into license agreements with every known handset supplier", and thus dominated modem chipset sales in the relevant markets. *See*, *e.g.*, 15-ER-3351 (CCAC) ¶¶ 11, 55, 69, 72. And, at least in the posture of this motion, Qualcomm made no countervailing pro-competitive justifications for their conduct. The Court should thus reverse the district court's dismissal of Plaintiffs' tying claims.

# CONCLUSION

For the reasons above, the decisions and Order of the district court should be reversed, and the case remanded for trial on the merits. In the alternative, the questions of California law set forth should be certified to the California Supreme Court.


Date: February 26, 2024          Respectfully submitted,


By: */s/ Adam J. Zapala*
Joseph W. Cotchett
Adam J. Zapala
Elizabeth Tran Castillo

COTCHETT, PITRE & MCCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
(650) 697-6000
jcotchett@cpmlegal.com
azapala@cpmlegal.com
ecastillo@cpmlegal.com

By: */s/ Kalpana Srinivasan*
Kalpana Srinivasan
Marc M. Seltzer
Amanda Bonn

SUSMAN GODFREY, LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
(310) 789-3100
ksrinivasan@susmangodfrey.com
mseltzer@susmangodfrey.com
abonn@susmangodfrey.com

*Appellants' Co-Lead Counsel*

## STATEMENT OF RELATED CASES
### For Case Number 23-3354

There are no Related Cases to disclose under Circuit Rule 28-2.6(b).


Date:  February 26, 2024                    Respectfully submitted,


By: */s/ Adam J. Zapala*                    By: */s/ Kalpana Srinivasan*
Joseph W. Cotchett                          Kalpana Srinivasan
Adam J. Zapala                              Marc M. Seltzer
Elizabeth Tran Castillo                     Amanda Bonn

COTCHETT, PITRE & MCCARTHY,                 SUSMAN GODFREY, LLP
   LLP                                      1900 Avenue of the Stars, Suite
840 Malcolm Road, Suite 200                    1400
Burlingame, CA 94010                        Los Angeles, CA 90067
(650) 697-6000                              (310) 789-3100
jcotchett@cpmlegal.com                      ksrinivasan@susmangodfrey.com
azapala@cpmlegal.com                        mseltzer@susmangodfrey.com
ecastillo@cpmlegal.com                      abonn@susmangodfrey.com


*Appellants' Co-Lead Counsel*

**CERTIFICATE OF COMPLIANCE**
**Circuit Rule 32-1(a), FRAP 32(a)(5), and FRAP 32(a)(6)**
**(For Case Number 21-56253)**

1. This document complies with the type-volume limits of Ninth Circuit Rule 32-1(a) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,980 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Date: February 26, 2024        Respectfully submitted,

By: */s/ Adam J. Zapala*
Joseph W. Cotchett
Adam J. Zapala
Elizabeth Tran Castillo

COTCHETT, PITRE & MCCARTHY,
   LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
(650) 697-6000
jcotchett@cpmlegal.com
azapala@cpmlegal.com
ecastillo@cpmlegal.com

By: */s/ Kalpana Srinivasan*
Kalpana Srinivasan
Marc M. Seltzer
Amanda Bonn

SUSMAN GODFREY, LLP
1900 Avenue of the Stars, Suite
  1400
Los Angeles, CA 90067
(310) 789-3100
ksrinivasan@susmangodfrey.com
mseltzer@susmangodfrey.com
abonn@susmangodfrey.com

*Appellants' Co-Lead Counsel*

63

## <u>CERTIFICATE OF SERVICE</u>

### No. 23-3354

_____

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

_____

IN RE: QUALCOMM ANTITRUST
LITIGATION

On Appeal from the United States District Court
for the Northern District of California
17-md-02773-JSC
Hon. Jaqueline S. Corley

_____

I hereby certify that, on February 26, 2024, I electronically filed the following with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

### 1.    APPELLANTS' OPENING BRIEF

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

_/s/ Adam J. Zapala_____