**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| SARAH KEY; ANDREW WESTLEY; TERESE RUSSELL; CARRA ABERNATHY, | No. 23-3354 |
| | D.C. No. 3:17-md-02773-JSC |
| *Plaintiffs - Appellants*, | |
| v. | OPINION |
| QUALCOMM INCORPORATED, a Delaware Corporation, | |
| *Defendant - Appellee*. | |

Appeal from the United States District Court
for the Northern District of California
Jacqueline Scott Corley, District Judge, Presiding

Argued and Submitted October 15, 2024
San Francisco, California

Filed February 25, 2025

Before: Ronald M. Gould, Jay S. Bybee, and Ryan D. Nelson, Circuit Judges.

Opinion by Judge R. Nelson

## SUMMARY[*]

### Antitrust Law

In a consolidated antitrust class action, the panel affirmed in part and vacated in part the district court's partial dismissal and partial summary judgment in favor of defendant Qualcomm Inc.

In an earlier suit, the Federal Trade Commission alleged that Qualcomm's business practices violated federal and state antitrust law. These practices included (1) Qualcomm's "no license, no chips" policy, under which Qualcomm refused to sell modem chips to cellular manufacturers that did not take licenses to practice Qualcomm's patents, and (2) Qualcomm's alleged exclusive dealing agreements with major device manufacturers Apple and Samsung. In the subsequent consolidated class action, plaintiffs attacked the business practices challenged by the FTC: (1) tying chip sales to standard essential patent licenses, (2) refusing to deal with rival chip manufacturers, and (3) exclusive dealing with Apple and Samsung. The district court certified a nationwide class, and Qualcomm appealed pursuant to Fed. R. Civ. P. 23(f).

After a bench trial in the FTC action, the district court ruled for the FTC and enjoined Qualcomm's challenged practices, but this court reversed in *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020), holding that Qualcomm did not violate the Sherman Act. In the Rule 23(f) appeal, this court vacated the class certification order and remanded with

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

instructions to consider whether any of plaintiffs' claims were viable in the wake of *FTC v. Qualcomm*. On remand, plaintiffs proceeded only with their state-law claims under California's Cartwright Act and Unfair Competition Law, or UCL. The district court dismissed plaintiffs' tying claims and granted summary judgment on their claims for exclusive dealing.

Affirming in part, the panel held that the district court did not err by dismissing plaintiffs' claim that Qualcomm's "no license, no chips" policy was tying in violation of the Cartwright Act. The panel concluded that the Cartwright Act did not depart from the Sherman Act to undercut *FTC v. Qualcomm*'s holding that the "no license, no chips" policy did not impose an anticompetitive surcharge on rivals' modem chip sales in violation of the Sherman Act. In addition, plaintiffs could not establish an unlawful tying claim in the absence of evidence of some tied market foreclosure or anticompetitive impact in the tied product market.

The panel also affirmed, with one caveat, the district court's rejection of plaintiffs' claim that Qualcomm's tying and purported exclusive dealing practices violated the UCL. Plaintiffs failed to state a claim that Qualcomm's practices were fraudulent under the UCL. Their UCL unfairness claim failed as to a theory of unfair tying. The panel held that, as to plaintiffs' exclusive dealing theory, they could not avail themselves of equitable relief, the only relief afforded by the UCL. The panel therefore vacated in part the district court's summary judgment and remanded with instructions to dismiss the UCL claim, to the extent that it relied on a theory of unfairness and related to Qualcomm's purported exclusive dealing agreements seeking restitution, without prejudice for refiling in state court.

As to the district court's summary judgment on the remainder of the Cartwright Act claim, the panel held that the district court did not abuse its discretion in excluding a proposed supplemental expert report as a sanction under Fed. R. Civ. P. 37(c)(1). The panel affirmed the district court's summary judgment on plaintiffs' claim for exclusive dealing under the Cartwright Act because plaintiffs did not raise a genuine dispute about (1) substantial market foreclosure or (2) antitrust injury caused by any agreement between Qualcomm and Apple.

**COUNSEL**

Adam J. Zapala (argued), Elizabeth T. Castillo, James G. Dallal, and Joseph W. Cotchett, Cotchett Pitre & McCarthy LLP, Burlingame, California; Kalpana Srinivasan, Marc M. Seltzer, Amanda Bonn, and Lora Krsulich, Susman Godfrey LLP, Los Angeles, California; Steve Berman, Hagens Berman Sobol Shapiro LLP, Seattle, Washington; for Plaintiffs-Appellants.

Eugene M. Paige (argued), Robert A. Van Nest, Kristin E. Hucek, Daniel B. Twomey, Jasmine K. Virk, and Cody S. Harris, Keker Van Nest & Peters LLP, San Francisco, California; Geoffrey T. Holtz, Morgan Lewis & Bockius LLP, San Francisco, California; Richard S. Taffet, Morgan Lewis & Bockius LLP, New York, New York; for Defendant-Appellee.

## OPINION

R. NELSON, Circuit Judge:

Plaintiffs sued Qualcomm Inc., tracking the Federal Trade Commission's (FTC) theories that Qualcomm's business practices violated state and federal antitrust law. These business practices include (1) Qualcomm's "no license, no chips" policy, under which Qualcomm refuses to sell modem chips to cellular manufacturers that do not take licenses to practice Qualcomm's patents, and (2) Qualcomm's alleged exclusive dealing agreements with major device manufacturers Apple and Samsung.

After the FTC's action failed, Plaintiffs pivoted to state-law claims under modified theories of antitrust harm. But Plaintiffs' state law claims—even as modified—fail. So we largely affirm the district court's judgments against Plaintiffs. But because the district court lacked equitable jurisdiction over Plaintiffs' UCL unfairness claim of exclusive dealing, we vacate and remand with instructions to dismiss that claim without prejudice for refiling in state court.

I

A

Since its founding in 1985, Qualcomm has contributed to core technological innovations underlying modern cellular systems, including third-generation (3G) CDMA and fourth-generation (4G) LTE cellular standards. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 982 (9th Cir. 2020). As a result, Qualcomm "exercised market dominance in the 3G and 4G cellular modem chip markets for many years, and its business practices have played a powerful and disruptive

role in those markets, as well as in the broader cellular services and technology markets." *Id.* at 1005.

On top of manufacturing and marketing cellular modem chips, Qualcomm protects its strong market foothold through patents that it licenses to third parties. *Id.* at 982–83. Qualcomm issues licenses to original equipment manufacturers (OEMs) such as Apple and Samsung. *Id.* Qualcomm's patent portfolio includes cellular standard essential patents (SEPs), non-cellular SEPs, and non-SEPs. *Id.* at 982–83. Cellular SEPs represent "patents on technologies that international standard-setting organizations . . . choose to include in technical standards practiced by each new generation of cellular technology." *Id.* at 982; *see also id.* at 985–86 & n.9. Qualcomm's cellular SEPs deal with the intricacies of CDMA and premium LTE technologies (that is, how cellular devices communicate with their respective 3G or 4G cellular networks) and are essential to comply with the cellular standards imposed by the standard-setting organizations. *Id.* at 983. Thus, these organizations require patent holders like Qualcomm to license their cellular SEPs on fair, reasonable, and nondiscriminatory (FRAND) terms. *Id.*

Like many other SEP licensors, Qualcomm licenses its patent portfolios exclusively to OEMs, "setting the royalty rates on its CDMA and LTE patent portfolios as a percentage of the end-product sales price." *Id.* at 984. Doing so protects Qualcomm from patent exhaustion, which occurs when "the initial authorized [or licensed] sale of a patented item

terminates all patent rights to that item." *Id.* (quotation omitted).[1]

And because rival chip manufacturers practice many of Qualcomm's SEPs by necessity, Qualcomm offers not to assert its patents in exchange for the promise not to sell chips to unlicensed OEMs. Essentially, these agreements function as "patent-infringement indemnifications" and apprise Qualcomm of its rivals' agreements with various OEMs. *Id.* at 984–85. But "they also allow Qualcomm's competitors to practice Qualcomm's SEPs royalty-free." *Id.* at 985.

Qualcomm reinforces these practices with its so-called "no license, no chips" policy. *Id.* Under that policy, Qualcomm "refuses to sell modem chips to OEMs that do not take licenses to practice Qualcomm's SEPs," thereby tying chip sales to SEP licenses. *Id.* "Qualcomm's practices, taken together, are 'chip supplier neutral'—that is, OEMs are required to pay a per-unit licensing royalty to Qualcomm for its patent portfolios regardless of which company they choose to source their chips from." *Id.*

In 2011 and 2013, Qualcomm signed licensing deals with Apple. Qualcomm offered Apple billions of dollars in incentive payments as long as Apple exclusively sourced its modem chips from Qualcomm and bought certain quantities of chips each year. *Id.* at 986. Apple terminated the agreements in 2014. *Id.* Even so, these agreements—in addition to the "no license, no chips" policy and Qualcomm's decision not to deal with rival chipmakers—

---

[1] If Qualcomm licensed its SEPs to "upstream" manufacturers, then its patent rights would be exhausted when those rivals sold their products to OEMs. *FTC v. Qualcomm*, 969 F.3d at 984. Accordingly, OEMs would have little incentive to pay Qualcomm for patent licenses, since they could buy products downstream. *Id.*

eventually caught the FTC's attention. In early 2017, the
FTC sued Qualcomm, claiming that these practices were
anticompetitive and violated Section 5(a) of the FTC Act.
*See* Compl. for Equitable Relief at 2, *FTC v. Qualcomm Inc.*,
No. 5:17-cv-220-LHK, 2017 WL 242848 (N.D. Cal. Jan. 17,
2017). Taken together, the FTC alleged that these practices
harmed competition in the CDMA and LTE modem chips
product markets. *See id.* at 31.

B

The FTC action inspired several lawsuits asserting
related theories of harm, which were centralized in the
Northern District of California, forming this matter.
Plaintiffs' initial consolidated class action asserted claims
under the Sherman Act, 15 U.S.C. § 1 *et seq.*; California's
Cartwright Act, CAL. BUS. & PROF. CODE § 16720 *et seq.*;
and California's Unfair Competition Law, *id.* § 17200 *et seq.*

The consolidated class action attacked the three business
practices challenged by the FTC: (1) tying chip sales to SEP
licenses, (2) refusing to deal with rival chip manufacturers,[2]
and (3) exclusive dealing with Apple and Samsung.
Plaintiffs relied heavily on the FTC's allegations and
theories, often citing the FTC's complaint and arguments.
Discovery in this case and the FTC action were coordinated.

The district court substantially denied Qualcomm's
original motion to dismiss and certified a nationwide class.
*See In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948,
983 (N.D. Cal. 2017). Expert discovery subsequently

---

[2] Plaintiffs never challenge the refusal to deal theory in the argument
section of their brief. And in reply, they clarify that they "are not
challenging a refusal to deal in isolation." So this theory of liability is
waived.

closed. The Ninth Circuit granted Qualcomm's Rule 23(f) petition to appeal the class certification and the district court stayed the case.

Meanwhile, the FTC's case against Qualcomm went to trial. Following a bench trial, the district court ruled for the FTC and enjoined Qualcomm's challenged practices. *See FTC v. Qualcomm Inc.*, 411 F. Supp. 3d 658, 820–24 (N.D. Cal. 2019). But, after staying the district court's injunction pending appeal, we reversed and vacated that order. *FTC v. Qualcomm*, 969 F.3d at 982. We held that "the district court went beyond the scope of the Sherman Act" when entering its injunction. *Id.* And we held that "Qualcomm's OEM-level licensing policy, however novel, is not an anticompetitive violation of the Sherman Act." *Id.* at 995.

We also explained that "the district court failed to identify how the ['no license, no chips'] policy directly impacted Qualcomm's competitors or distorted 'the area of effective competition.'" *Id.* at 1001 (quotation omitted). Finally, we rejected the FTC's challenge to Qualcomm's expired agreements with Apple. *Id.* 1004–05. Those agreements "did not have the actual or practical effect of substantially foreclosing competition in the CDMA modem chip market." *Id.* at 1005.

In this case, we ordered supplemental briefing regarding the effect of *FTC v. Qualcomm* on the Rule 23(f) appeal. *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1066 (9th Cir. 2021). We vacated the class certification order, concluding that it was improper to apply California's Cartwright Act to a nationwide class. *Id.* at 1074. We then remanded with instructions to consider whether any of Plaintiffs' claims were viable in the wake of *FTC v. Qualcomm*. *Id.* at 1075. As we observed, extraordinary differences would need to

exist between *FTC v. Qualcomm* and the current case for the latter to survive. *Id.*

On remand, the district court granted Plaintiffs leave to file a second amended complaint. Plaintiffs abandoned their Sherman Act claims, proceeding only with their state-law claims under the Cartwright Act and California's Unfair Competition Law. Through their second amended complaint, Plaintiffs focused their attack on Qualcomm's "no license, no chips" policy, alleging that Qualcomm's refusal to deal with rival chip suppliers and purported exclusive dealing arrangements with OEMs "exacerbated the anticompetitive effects of" the tying arrangement.

The district court granted Qualcomm's motion to dismiss Plaintiffs' amended complaint in part. *See In re Qualcomm Antitrust Litig.*, No. 17-md-2773, 2023 WL 121983 (N.D. Cal. Jan. 6, 2023). It concluded that Plaintiffs' allegations about Qualcomm's unlawful tying of chips and SEPs were "not viable under current California law," *id.* at \*1, that Plaintiffs failed to plead harm to the alleged tied market, and that Plaintiffs failed to cite any case "finding an antitrust tying violation where a 'tied' product has . . . no 'rival sellers,'" *id.* at \*18 (quotation omitted). It also dismissed Plaintiffs' related tying claim under the UCL. *Id.* at \*20–22.

The district court did not dismiss Plaintiffs' claims for exclusive dealing under the Cartwright Act or the UCL. *Id.* at \*19. It observed that Plaintiffs were not bound by the government's failure to adduce sufficient evidence of market foreclosure in the FTC action. *Id.* Given the substantial narrowing of the action, Plaintiffs sought more discovery on damages caused by Qualcomm's exclusive dealing to develop their remaining theories of liability, which had been secondary in their case. The district court denied their

request. Plaintiffs did not move for reconsideration of that decision.

Qualcomm moved for summary judgment. Plaintiffs relied on a proposed supplemental expert report from Dr. Kenneth Flamm to oppose summary judgment. Dr. Flamm opined on the competitive impact of Qualcomm's exclusivity arrangements with Apple and other OEMs. Citing Rule 37(c)(1) of the Federal Rules of Civil Procedure and noting that Dr. Flamm wrote his report "over four years after discovery closed," the district court excluded the supplemental report. *In re Qualcomm Antitrust Litig.*, No. 17-md-2773, 2023 WL 6301063, at \*2–5 (N.D. Cal. Sept. 26, 2023).

After considering the remaining evidence, the district court concluded that Plaintiffs had shown no genuine dispute of fact as to whether Qualcomm had an exclusive dealing arrangement with Samsung. *Id.* at \*5–6. As to exclusive dealing with Apple, Plaintiffs failed to show any triable issue of fact about market foreclosure or consumer injury. *Id.* at \*6–7. The court also denied Plaintiffs an injunction because it determined that there was no "current or future threat of anticompetitive harm," and it denied Plaintiffs equitable restitution because they had an adequate remedy at law under the Cartwright Act. *Id.* at \*8. Accordingly, the court entered summary judgment for Qualcomm. *Id.* This appeal timely followed.

II

The district court had diversity and supplemental jurisdiction. 28 U.S.C. §§ 1332(d), 1367. We have jurisdiction under 28 U.S.C. § 1291.

We review an order granting a motion to dismiss de novo. *Palm v. L.A. Dep't of Water & Power*, 889 F.3d 1081, 1085 (9th Cir. 2018). The same standard applies to orders of summary judgment. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 921 (9th Cir. 2015). Discovery sanctions are reviewed for an abuse of discretion. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1105 (9th Cir. 2001).

### III

### A

### 1

First, the district court did not err by dismissing Plaintiffs' claim that Qualcomm's "no license, no chips" policy violated the Cartwright Act. To begin, we see no reason that the Cartwright Act would depart from the Sherman Act to undercut *FTC v. Qualcomm*'s holding that the "no license, no chips" agreements did "not impose an anticompetitive surcharge on rivals' modem chip sales" because Qualcomm's policy was chip supplier neutral. 969 F.3d at 1005. As we decided, the "no license, no chips" policy is not anticompetitive in the first place. *Id.* at 1002, 1005.

Additionally, much like its federal counterpart, the Cartwright Act defines a tying arrangement as one in which "a party agrees to sell one product (the tying product) on the condition that the buyer also purchase a different product (the tied product), thereby *curbing competition* in the sale of the tied product." *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 183 (1999) (emphasis added); *see also Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1090 (9th Cir. 2009) (discussing the Sherman Act); *Teradata Corp. v.*

*SAP SE*, 124 F.4th 555, 574 (9th Cir. 2024). The Cartwright Act also tracks federal law by proscribing tying agreements *because* such agreements "inevitably curb[]" "competition on the merits with respect to the tied product." *Suburban Mobile Homes, Inc. v. Amfac Cmtys., Inc.*, 101 Cal. App. 3d 532, 542 (1980) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 (1958)); *Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224, 1234 (2007); *accord Freeman*, 77 Cal. App. 4th at 184.

Thus, in considering tying claims under the Cartwright Act, courts must ascertain whether the alleged tying agreements "restrain competition in the tied product market." *SC Manufactured Homes, Inc. v. Liebert*, 162 Cal. App. 4th 68, 85 (2008) (citing *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 34–38 (2006)). Plaintiffs' argument presumes, however, that a tying agreement can be unlawful even with no competition in the tied product's market. The tying products here are Qualcomm's chips; the tied product is Qualcomm's cellular SEP portfolio.

Plaintiffs rely on *Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534 (1998), which, they argue, holds that market foreclosure is not a necessary element for a tying claim. But *Morrison* does not create an exception to the baseline rule. Indeed, *Morrison* assumes that a market for the tied product must exist as a threshold matter. When antitrust plaintiffs do not allege that they "would have purchased the [tied product] from someone else if not forced to buy [it] from [the defendant]," no substantial foreclosure of the tied market is pleaded. 66 Cal. App. 4th at 543; *accord Freeman*, 77 Cal. App. 4th at 184 (existence of a market for both the tying and tied products is a "threshold element for a tying claim").

And even assuming, *arguendo*, that Plaintiffs did not need to plead substantial foreclosure of the tied market, *Morrison* still requires a market for the tied product to support a tying claim. This is because, where no market exists for the tied product, there can be no antitrust injury. *Id.* at 548–49. "[F]orcing a consumer to buy something that he or she would not buy elsewhere does not injure competition." *Morrison*, 66 Cal. App. 4th at 548. In such cases, the "tie simply increases the effective price of the tying product." *Id.* The "real injury about which [Plaintiffs] complain" here, as in *Morrison*, is that Qualcomm has inflated its prices. *Id.* at 549.

While "[t]his practice may implicate" the effective price of Qualcomm's products, it is not an anticompetitive tying arrangement and it "could not have foreclosed competition in the tied product market" since OEMs could "not have purchased the tied product elsewhere." *Id.* at 548–49. Those patents, by construction, are available only from Qualcomm, which is given a legitimate monopoly over its patents by law. *See Transparent-Wrap Mach. Corp. v. Stokes & Smith Co.*, 329 U.S. 637, 644 (1947).

At bottom, "[u]nder both the Cartwright Act and the Sherman Act, in the absence of evidence of some tied market foreclosure or anticompetitive impact in the tied product market, the plaintiff cannot establish an unlawful tying claim." *Belton*, 151 Cal. App. 4th at 1234.

2

Relatedly, Plaintiffs' argument that Qualcomm abused its patent rights by violating its FRAND commitments fails.[3]

---

[3] At argument, Plaintiffs recharacterized their claims, highlighting Qualcomm's agreements not to assert its patents in exchange for the

Plaintiffs rely on *In re Cipro Cases I & II*, 61 Cal. 4th 116 (2015). Patents are involved both here and in *Cipro*, but that's about where the similarities end. *Cipro* must be understood in the unique context of reverse settlement payments between horizontal competitors, where the scope of the patent test does not govern. *Id.* at 145, 148, 151, 162-63. *Cipro* does not concern "vertical (seller-customer) agreement[s]." *In re Qualcomm Antitrust Litig.*, 2023 WL 121983, at \*18; *cf. Ohio v. Am. Express Co.*, 585 U.S. 529, 541, 543 & n.7 (2018) (discussing and defining horizontal and vertical restraints).

*In re Cipro Cases I & II* laid out a four-part test for reverse settlements under the Cartwright Act. *See* 61 Cal. 4th at 151, 163. But that sort of horizontal, reverse settlement payment claim is not at issue here. Indeed, Plaintiffs did not plead essential elements of a *Cipro* claim, including that the amount of the payment exceeded anticipated future litigation costs. *Id.* 153–54.

Nor does *Cipro* address—directly or indirectly—tying claims under the Cartwright Act. And it does not modify the bottom-line of California's tying jurisprudence: a tying claim depends on competition in the tied market (which Plaintiffs failed to show). No fair reading of *Cipro* supports Plaintiffs' theory of anticompetitive harm or the proposition that the tied product can be defined to "include[] an agreement not to challenge" a cellular SEP. And Qualcomm's "no license, no chips" policy is still chip supplier neutral and thus does not distort the area of effective competition. *See FTC v. Qualcomm*, 969 F.3d at 1002–03.

---

promise not to sell chips to unlicensed OEMs. Plaintiffs conceded, however, that this argument was not raised directly in the briefs.

*Cipro* would have to be stretched greatly to be transformed into a tying case. Absent a "clear holding from the California Supreme Court," we decline to make this leap ourselves. *Lozano v. AT&T Wireless Servs.*, 504 F.3d 718, 736 (9th Cir. 2007). *Cipro* is irrelevant to the questions dispositive to Plaintiffs' tying claim. And because *Cipro* cannot shoehorn a theory of Cartwright Act liability for the supra-FRAND licensing rates, "the remedy for such a breach [of FRAND commitments] lies in contract and patent law." *FTC v. Qualcomm*, 969 F.3d at 1005.

B

Next, the district court did not err in rejecting Plaintiffs' claim that Qualcomm's tying and purported exclusive dealing practices violated California's Unfair Competition Law. The UCL prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice." CAL. BUS. & PROF. CODE § 17200. Each of these three theories—unlawfulness, unfairness, and fraud— provides a separate "variet[y]" of unfair competition. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).[4]

The district court concluded that Plaintiffs failed to state a claim that Qualcomm's practices were fraudulent under the UCL. *In re Qualcomm Antitrust Litig.*, 2023 WL 121983, at \*22. The district court later granted summary judgment against Plaintiffs on their remaining UCL theories for unlawfulness and unfairness because it couldn't provide the relief they sought. *In re Qualcomm Antitrust Litig.*, 2023 WL 6301063, at \*8–9. Plaintiffs don't address the basis for

---

[4] Plaintiffs do not adequately address UCL unlawfulness theories in their opening brief, and so we do not consider that issue.

summary judgment on a significant portion of their UCL claim. That said, we affirm the district court with one caveat.

1

The district court correctly concluded that Plaintiffs failed to state a claim that Qualcomm's practices were fraudulent under the UCL. *See In re Qualcomm Antitrust Litig.*, 2023 WL 121983, at \*22. The parties dispute whether reliance is necessary for UCL fraud liability or whether a "causal connection" suffices. But the California Supreme Court has repeatedly reaffirmed that "reliance is the causal mechanism of fraud." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 326 (2011) (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009)); *accord Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 793 (9th Cir. 2012).

Thus, any plaintiff relying on a UCL fraud theory "must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions." *Kwikset*, 51 Cal. 4th at 326–27 (quoting *In re Tobacco II Cases*, 46 Cal. 4th at 306). "Reliance," in this context, means "reliance on a statement for its truth and accuracy." *Id.* at 327 n.10 (citing *Spreckels v. Gorrill*, 152 Cal. 383, 395 (1907)). In other words, "a UCL fraud plaintiff must allege he or she was motivated to act or refrain from action based on the truth or falsity of a defendant's statement, not merely on the fact it was made." *Id.* (citing *Buckland v. Threshold Enters., Ltd.*, 155 Cal. App. 4th 798, 818–19 (2007)).

Plaintiffs allege no such reliance or action based on the truth or falsity of any statement. Nor do they allege that they were induced to act based on Qualcomm's tying agreements. They only allege that Qualcomm "made misrepresentations"

and that the prices they paid for certain goods were inflated. In any case, Plaintiffs provide no good reason to disagree with the *FTC v. Qualcomm* district court, which found no "intentional deception of [standard-setting organizations] on the part of Qualcomm." *FTC v. Qualcomm*, 969 F.3d at 996–97. Thus, Plaintiffs failed to state a cognizable UCL fraud claim.

2

Plaintiffs' UCL unfairness claim fails for several reasons. First, regarding tying, Qualcomm's "no license, no chips" policy does not violate the letter, policy, or spirit of federal or state antitrust law. *See id.* at 1005; *Cel-Tech*, 20 Cal. 4th at 187 ("[T]he word 'unfair' . . . means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws"). And Qualcomm's "no license, no chips" policy is not "unfair" under any theory. *See Cel-Tech*, 20 Cal. 4th at 186–87 (1999); *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001). So Plaintiffs cannot avail themselves of a theory of unfair tying to prove UCL liability.

As to their exclusive dealing theory, Plaintiffs cannot avail themselves of equitable relief—the only relief afforded by the UCL. *Hodge v. Superior Ct.*, 145 Cal. App. 4th 278, 284 (2006); *Cel-Tech*, 20 Cal. 4th at 179.

The "primary form of relief" available under the UCL "is an injunction." *In re Tobacco II Cases*, 46 Cal. 4th at 319; *see* CAL. BUS. & PROF. CODE § 17203. "An injunction would not serve the purpose of prevention of future harm if only those who had already been injured by the practice were entitled to that relief." *In re Tobacco II Cases*, 46 Cal. 4th at 320; *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (injunctions do not remedy completed harm).

Thus, an "injunction should not be granted as punishment for past acts where it is unlikely that they will recur." *In re Tobacco II Cases*, 46 Cal. 4th at 320 (quoting *Choice-in-Educ. League v. L.A. Unified Sch. Dist.*, 17 Cal. App. 4th 415, 422 (1993)).

As the district court concluded, Qualcomm is unlikely to again enter into similar exclusivity agreements with Apple, Samsung, or other OEMs. *In re Qualcomm Antitrust Litig.*, 2023 WL 6301063, at *8. As a result, the past exclusivity agreements complained of "do not pose any current or future threat of anticompetitive harm." *FTC v. Qualcomm*, 969 F.3d at 1005. Thus, the district court did not abuse its discretion in denying an injunction. *See Sardi's Rest. Corp. v. Sardie*, 755 F.2d 719, 722 (9th Cir. 1985) (denial of equitable relief reviewed for abuse of discretion).

The UCL also permits "ancillary relief" that is "necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.'" *In re Tobacco II Cases*, 46 Cal. 4th at 319 (quoting CAL. BUS. & PROF. CODE § 17203). But Plaintiffs "must establish that [they] lack[] an adequate remedy at law before securing equitable restitution for past harm under the UCL[.]" *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). And where an adequate legal remedy exists, federal courts are precluded from awarding equitable relief, at least in the form of equitable restitution. *Id*. at 842 (discussing *Byrd v. Blue Ridge Rural Elec. Corp.*, 356 U.S. 525, 537–39 (1958)). This rule is jurisdictional. *Id*. at 842–43.

As in *Sonner*, Plaintiffs' complaint "does not allege that [they] lack[] an adequate legal remedy." *Id*. at 844 (citing *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)). The

Cartwright Act provides for treble damages—hardly an inadequate remedy. As the district court concluded, Plaintiffs stated an exclusive dealing claim under the Cartwright Act but failed to prove it at summary judgment. *In re Qualcomm Antitrust Litig.*, 2023 WL 6301063, at \*8. Their failure to prove their Cartwright Act claim, however, "does not make that remedy inadequate." *Id.* Because Plaintiffs have failed to show that their remedy at law was inadequate, the district court could not exercise its equitable powers. *See Guzman v. Polaris Indus.*, 49 F.4th 1308, 1312 (9th Cir. 2022).

So rather than grant summary judgment, the court "should have dismissed [Plaintiffs'] UCL claim without prejudice to refiling the same claim in state court." *Id.* at 1314. Accordingly, we vacate the district court's grant of summary judgment on Plaintiffs' UCL claim and remand with instructions to dismiss this claim—to the extent that it relies on a theory of unfairness and relates to Qualcomm's purported exclusive dealing agreements seeking restitution—without prejudice for refiling in state court. In all other regards, we affirm the district court's disposition of the UCL claim.

C

Before considering the grant of summary judgment on what remains of Plaintiffs' Cartwright Act claim, we consider whether the district court abused its discretion in excluding a proposed supplemental expert report. We conclude that it did not. In opposing summary judgment, Plaintiffs submitted a proposed supplemental report from proffered expert witness Dr. Flamm, written over four years after the close of expert discovery. The district court did not consider that supplemental report at summary judgment. *See*

*In re Qualcomm Antitrust Litig.*, 2023 WL 6301063, at \*2–5.

Plaintiffs argue that the district court had an independent obligation to determine whether the supplementation would be substantially justified or harmless. And Plaintiffs argue that, because excluding the supplemental report was "tantamount to dismissal," the district court also had to find willfulness, fault, or bad faith by Plaintiffs and consider whether lesser sanctions would be adequate.

1

Plaintiffs never explained to the district court why it would have been harmless to allow the untimely supplemental expert report. And when "the noncompliant party fails to argue harmlessness, a district court need not hold a *sua sponte* hearing on that issue before imposing Rule 37(c)(1)'s default sanction" of exclusion. *Merchant v. Corizon Health, Inc.*, 993 F.3d 733, 741 (9th Cir. 2021) (citing *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175 (9th Cir. 2008)).

Federal Rule of Civil Procedure 26(a)(2) requires parties to disclose the identity of a witness they may call at trial to present evidence. Parties that retain or hire an expert witness must disclose that expert's written report, which must contain, among other things, a complete statement of his opinions and their basis. FED. R. CIV. P. 26(a)(2)(B). Expert reports must be disclosed "at the times and in the sequence that the court orders." *Id.* 26(a)(2)(D). A party "must supplement these disclosures when required under Rule 26(e)." *Id.* 26(a)(2)(E). Rule 26(e), in turn, requires that a party "must supplement" disclosures "in a timely manner if the party learns that in some material respect the disclosure

or response is incomplete or incorrect," or as ordered by the court.

Rule 37(c)(1) "gives teeth to these requirements" by forbidding the use of any information not properly disclosed. *Yeti by Molly*, 259 F.3d at 1106. That is, when a party fails to provide information required by Rule 26, such party "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). "Implicit in Rule 37(c)(1) is that the burden is on the party facing sanctions to prove harmlessness." *Yeti by Molly*, 259 F.3d at 1107. This sanction is "self-executing" and "automatic." *Id.* at 1106 (quotation omitted); 8B CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. CIV. § 2289.1 (3d ed., updated Sept. 17, 2024).

After all, to place the burden on the district court to conduct such harmlessness analyses *sua sponte* "would collapse the rule's provision of automatic exclusion . . . into an open-ended approach that is divorced from the text of the rule." *Merchant*, 993 F.3d at 741 (quoting *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 705 (8th Cir. 2018)).

The district court set a deadline for expert discovery. Plaintiffs' supplemental report was four years late. *In re Qualcomm Antitrust Litig.*, 2023 WL 6301063, at \*3. The supplement was not offered because "in some material respect the disclosure or response [was] incomplete or incorrect," FED. R. CIV. P. 26(e)(1)(A), but because Plaintiffs shifted their litigation strategy. And after Rule 37's automatic, self-executing sanction of exclusion, Plaintiffs did not seek reconsideration or argue harmlessness. So even if the district court offered no harmlessness analysis, it

would not have abused its discretion, because the burden was on Plaintiffs to invite the harmlessness analysis.

Still, the district court *did*, in fact, find that the late supplementation was neither harmless nor substantially justified. *See In re Qualcomm Antitrust Litig.*, 2023 WL 6301063, at \*4–5. It concluded that Qualcomm "identif[ied] prejudice because Plaintiffs submitted this belated opinion four years after the close of expert discovery." *Id.* at \*4. And the late disclosure was not substantially justified because Plaintiffs "chose to model damages based on a novel theory rather than a traditional, longstanding antitrust theory pled in their complaint." *Id.* Neither conclusion was an abuse of discretion.

2

The harmlessness analysis is modified when exclusion is tantamount to dismissal. In that case, courts must consider "whether the claimed noncompliance involved willfulness, fault, or bad faith" and "the availability of lesser sanctions." *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1247 (9th Cir. 2012). But that consideration is of no moment here. Plaintiffs suggested that their case could survive summary judgment even without Dr. Flamm's supplemental report. So the exclusion of the evidence was not tantamount to dismissal.

Second—and more importantly—the burden remains on the party facing sanctions to show and prove harmlessness. *Merchant*, 993 F.3d at 741 (citing *Vanderberg*, 906 F.3d at 705); *R & R Sails*, 673 F.3d at 1246. And Plaintiffs failed to carry that burden. *R&R Sails* does not disturb the basic principle baked into the text of Rule 37 that a sanctioned party bears that burden, even when expert evidence is "case dispositive." *Merchant*, 993 F.3d at 737; *see also Yeti by*

*Molly*, 259 F.3d at 1106 ("Courts have upheld the use of the sanction even when a litigant's entire cause of action or defense has been precluded.").

When exclusion is tantamount to dismissal, the additional *R&R Sails* considerations are "incorporated" into Rule 37(c)(1)'s "harmlessness inquiry," *Merchant*, 993 F.3d at 741, but a party must still carry their burden and argue harmlessness, *see id.* at 742.

In any event, the district court found Plaintiffs at fault for the late report. *See In re Qualcomm Antitrust Litig.*, 2023 WL 6301063, at \*4. Dr. Flamm's report expressly disclaimed the opinions that Plaintiffs later sought to add through the supplemental report. So even if the district court were required, on its own initiative, to conduct a bad-faith analysis, it did so.

## D

Although the district court found that Plaintiffs stated a claim for exclusive dealing under the Cartwright Act, it granted Qualcomm summary judgment on this claim. An exclusive dealing agreement is one in which a buyer agrees to only buy a seller's product, forgoing competitors' products. *Fisherman's Wharf Bay Cruise Corp. v. Superior Ct. of S.F.*, 114 Cal. App. 4th 309, 334–35 (2003).

"In California, exclusive dealing arrangements are not deemed illegal per se." *Id.* at 335. They may have procompetitive effects by incentivizing "the marketing of new products and a guarantee of quality-control distribution." *Id.* Because of this, they are analyzed under a rule of reason analysis: an exclusive dealing arrangement is illegal only when it (1) significantly foreclosed the market to

competitors and (2) this foreclosure injured the plaintiffs. *Id.* at 335–39.

We affirm the grant of summary judgment against Plaintiffs on this claim because Plaintiffs do not raise a genuine dispute about (1) substantial market foreclosure or (2) antitrust injury caused by any agreement between Qualcomm and Apple.[5]

1

"[E]ven if exclusive dealing can be proved, it will not be actionable under [the Cartwright Act] unless it forecloses competition in a substantial share of the affected market." *Fisherman's Wharf*, 114 Cal. App. 4th at 335. "[C]ourts and commentators have not settled on a minimum percentage as constituting significant foreclosure." *Id.* at 336; *cf.* 11 AREEDA & HOVENKAMP, ANTITRUST LAW 159–65, ¶ 1821c (1998 ed.).

Still, antitrust plaintiffs must define the relevant market and prove the degree of foreclosure. *FTC v. Qualcomm*, 969 F.3d at 992 ("A threshold step in any antitrust case is to accurately define the relevant market."); *accord Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) ("Without a definition of [a] market there is no way to measure [a party's] ability to lessen or destroy competition."). Under the Cartwright Act, as with the Sherman Act, substantial market foreclosure depends on

---

[5] Plaintiffs, in the argument section of their opening brief, do not challenge the district court's conclusion that there was no genuine dispute that Qualcomm and Samsung had no exclusivity agreement. So we do not consider that issue here. *Transamerica Life Ins. Co. v. Arutyunyan*, 93 F.4th 1136, 1146 (9th Cir. 2024) (arguments not developed in the argument section of an appellant's opening brief are forfeited).

clear delineation of the market. Without delineating the market, no factfinder can logically find that any part—much less a substantial portion—of such market has been foreclosed. *Cf. Fisherman's Wharf*, 114 Cal. App. 4th at 335.

The district court determined that Plaintiffs had no duty to show a particular percentage of market foreclosure, concluding that California courts likely would not follow "such a mechanical approach." *In re Qualcomm Antitrust Litig.*, 2023 WL 6301063, at \*6. But it held that Plaintiffs failed to identify evidence defining the relevant market or showing market foreclosure in the two markets at issue— CDMA and premium LTE chipsets. *Id.* at \*6–7. That was correct. *See FTC v. Qualcomm*, 969 F.3d at 993.

Plaintiffs failed to identify sufficient, non-excluded evidence that cures their failure to identify the relevant markets and show substantial foreclosure therein. And this failure is dispositive—without "actual or practical" substantial foreclosure in the appropriate, relevant markets, Plaintiffs' exclusive dealing claim under the Cartwright Act fails. *FTC v. Qualcomm*, 969 F.3d at 1004–05.

2

Plaintiffs also failed to raise triable issues about antitrust injury. Plaintiffs relied on the expert report of Professor Elhauge to show antitrust injury to consumers. Elhauge states that Qualcomm's agreement with Apple "would naturally increase Qualcomm's monopoly power in chipsets, which would increase Qualcomm's ability to raise chipset prices throughout the market." According to Elhauge, this "would also give Qualcomm greater ability to use its ['no license, no chips'] tie to impose above-FRAND rates on SEPs throughout the market." As the district court

recognized, these facts would be relevant to Plaintiffs' pre-*FTC v. Qualcomm* tying theory. *In re Qualcomm Antitrust Litig.*, 2023 WL 6301063, at \*7.

Elhauge expressly claimed that "the anticompetitive effect" of the alleged exclusive dealing agreements is "the exacerbation of Qualcomm's ['no license, no chips']" policy. But if that policy did not cause antitrust injury, then any alleged exacerbation of that policy cannot cause antitrust injury, either. Plaintiffs cannot combine two "claim[s] that cannot succeed" and "alchemize them into a new form of antitrust liability." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009).[6]

Elsewhere, Elhauge suggested that OEMs "might be able to externalize an even higher percentage of the harm by passing much or all of the price increase on to downstream buyers." He also stated that "the anticompetitive effects of Qualcomm's conduct only cease once inflated chip prices and supra-FRAND royalties cease to be passed through to those purchasers." The district court concluded that these statements constituted "speculation" because Elhauge did not conduct a pass-through analysis "to calculate whether such a pass-through actually occurred here." *In re Qualcomm Antitrust Litig.*, 2023 WL 6301063, at \*7. Indeed, high prices alone are generally weak evidence of market foreclosure or economic injury. *See Teradata*, 2024 WL 5163082, at \*11; *Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993); *Ohio*, 585 U.S. at 549.

---

[6] We reversed the district court's judgment in *FTC v. Qualcomm* in part because it relied on similar theories of harm. *See* 969 F.3d at 993.

Elhauge's statement about what "might" happen was highly speculative. He assumed, rather than proved, that costs were passed through to consumers. This speculation cannot support a jury verdict in Plaintiffs' favor.

Ultimately, Plaintiffs have failed to adduce evidence that Qualcomm's agreements with Apple caused antitrust injury by foreclosing competition in the relevant markets; instead, the evidence shows that Apple elected to forgo payments from Qualcomm, terminate the agreement, and use Intel chips. *FTC v. Qualcomm*, 969 F.3d at 1004–05.  No evidence indicates that "Intel was a viable competitor to Qualcomm prior to" that point, and, like the FTC, Plaintiffs have failed to show that the 2013 Apple agreement substantially delayed Apple's transition to Intel. *Id.*  This is yet another reason why summary judgment was appropriate on Plaintiffs' exclusive dealing claim under the Cartwright Act.[7]

## IV

Qualcomm "has asserted its economic muscle 'with vigor, imagination, devotion, and ingenuity.'"  *FTC v. Qualcomm*, 969 F.3d at 1005 (quoting *United States v. Topco Assocs.*, 405 U.S. 596, 610 (1972)).  For many of the

---

[7] Plaintiffs also requested that we certify several questions to the California Supreme Court. We decline to do so just as on interlocutory appeal. "Certification is warranted if there is no controlling precedent and the California Supreme Court's decision could determine the outcome of a matter pending in our court." *Doe v. Uber Techs., Inc.*, 90 F.4th 946, 949 (9th Cir. 2024) (quotation omitted).  Controlling precedent answers the questions before us. *Cf.* Cal. App. R. 8.548(a). And we do not read California authorities—including *Cipro*—to interpret the Cartwright Act differently from the Sherman Act as material here. Nor are Plaintiffs' fact-specific theories broadly applicable. *See Mendoza v. Nordstrom, Inc.*, 778 F.3d 834, 841 (9th Cir. 2015).

same reasons as the FTC action that preceded and inspired this one, Plaintiffs' claims against Qualcomm fail. Several years ago, we noted that "there would have to be some extraordinary difference" between state and federal law for Plaintiffs' claims not to "fail as a matter of law." *Stromberg*, 14 F.4th at 1075. Plaintiffs fail to identify such differences.

At bottom, Plaintiffs do not state a cognizable tying Cartwright Act claim. And summary judgment is appropriate on their Cartwright Act exclusive-dealing claim. Their UCL theories are similarly unavailing. For the most part, then, we affirm the district court. But the district court lacked equitable jurisdiction to address Plaintiffs' UCL unfairness claim relying on a theory of exclusive dealing and seeking restitution. Therefore, we vacate the district court's summary judgment order in that respect and remand with instructions to dismiss that claim without prejudice to refile in state court.

**AFFIRMED IN PART, VACATED IN PART, and REMANDED.**